COMMONWEALTH vs. WILLIAM M. SHIPPS, JR.

Norfolk. January 5, 1987. — May 12, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & NOLAN, JJ.

*Homicide. Constitutional Law*, Admissions and confessions, Waiver of
constitutional rights, Assistance of counsel, Arrest. *Protective Custody.*
*Practice, Criminal*, Preservation of evidence, Disclosure of evidence,
Conduct of prosecutor, Argument by prosecutor. *Evidence*, Scientific
test. *Due Process of Law*, Disclosure of evidence. *Waiver. Arrest. Iden-*
*tification. Delinquent Child. Criminal Records. Firearms.*

Evidence at the hearing on a criminal defendant's motion to suppress his
    admissions to police, made after his arrest on unrelated charges, war-
    ranted the judge's conclusion that, notwithstanding the defendant's con-
    sumption of alcohol, he understood the Miranda warnings given him
    and voluntarily waived his rights. [826-827]
Evidence at the hearing on a criminal defendant's motion to suppress his
    admissions to police warranted the judge's conclusion that neither the
    defendant's youth nor his low intelligence prevented him from voluntarily
    waiving his Miranda rights. [827]
A criminal defendant was not entitled, on the basis of any violation of his
    right to counsel, to the suppression of his admissions to police following
    his arrest on unrelated charges. [827-828]
Violations by police of provisions of the protective custody statute, G. L.
    c. 111B, § 8, requiring notification of a juvenile's parents, did not
    require suppression of the juvenile's admissions to police officers while
    in their protective custody because, in the circumstances, there was no
    causal relationship between the improper police conduct and the defend-
    ant's statements. [828-830]
The judge at a murder trial was warranted in concluding that a witness's
    identification of a photograph as being that of the defendant had not
    occurred under procedures so suggestive as to give rise to a substantial
    likelihood of misidentification. [831]
Provisions of G. L. c. 119, § 60A, which shield juvenile court records
    from public inspection did not preclude police from using, for identifi-
    cation purposes during a murder investigation, a photograph taken of
    an individual as a result of a prior juvenile proceeding. [831-832]
Police have authority under G. L. c. 263, § 1A, to photograph and finger-
    print a juvenile who is arrested for an offense classified as a felony but

who is later, because of his age, charged only with delinquency under G. L. c. 119, §§ 53 & 54. [832-833]

At a murder trial, any infirmities in a witness's out-of-court selection of a photograph as representing a gun similar to the one he had observed in the defendant's possession on the night of the murders went to the weight and not to the admissibility of the witness's testimony. [833]

Although destructive metallurgical tests performed by government investigators upon certain objects allegedly stolen from a murder victim should have been documented photographically so that the photographic record would be available to a defendant charged with the murder, any error in the admission of the results of the tests at the defendant's trial was, in the circumstances, nonprejudicial in view of the other evidence linking him to the crimes. [834-837]

At a criminal trial there was no reversible error in the judge's denial of the defendant's motion for a mistrial after the prosecutor improperly allowed a witness to testify to evidence suggesting that the defendant may have committed other crimes, where, on balance, the improper suggestion was vague and the case against the defendant was strong. [837-838]

At a criminal trial the judge's prompt and forceful instructions cured any harm that may have resulted from the prosecutor's disparaging remarks, improperly made in front of the jury, concerning the qualifications of an expert witness for the defense. [838-839]

At a murder trial there was no impropriety in the prosecutor's arguing to the jury, during closing argument, that they might find the defendant guilty of murder in the first degree on the theory of extreme atrocity or cruelty, where the argument was based on the evidence and the inferences that could be drawn therefrom and where the judge, prior to the closing arguments, had not indicated whether he intended to instruct the jury on that theory of murder in the first degree. [839-840]

INDICTMENTS found and returned in the Superior Court Department on March 5, 1984.

Pretrial motions to suppress evidence were heard by *John J. Irwin, Jr.*, J., and the cases were tried before *Rudolph F. Pierce*, J.

*Joseph F. Krowski* for the defendant.

*Judith A. Cowin*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Convicted on two indictments charging murder in the first degree, the defendant, William M. Shipps, Jr., appeals. He also appeals two convictions of armed assault in a dwelling house, see G. L. c. 265, § 18A (1984 ed.), and

two convictions of armed robbery, see G. L. c. 265, § 17 (1984 ed.). The defendant asserts error in (1) the denials of his various motions to suppress incriminating statements, identification evidence, scientific tests, and evidence seized pursuant to a search warrant; (2) the denial of his motion for a mistrial based on evidence of unrelated crimes allegedly intentionally introduced by the prosecutor; and (3) other instances of prosecutorial misconduct. The defendant also requests that we exercise our power under G. L. c. 278, § 33E (1984 ed.), and reverse his convictions of murder in the first degree and order a new trial, or, at a minimum, vacate the consecutive life sentence imposed on the second conviction of murder in the first degree. We conclude that there was no reversible error. We decline to exercise our power under G. L. c. 278, § 33E, in favor of the defendant.

We summarize the evidence. In the early morning hours of July 24, 1982, an elderly brother and sister were murdered in their home in Stoughton. The victims, John J. Lucey and Esther L. King, were fatally wounded during an armed robbery. Ballistics evidence showed that the weapon used was one capable of firing .38 caliber ammunition, either a .38 or a .357 caliber weapon.

A few hours prior to the murders, the defendant was in his home in Stoughton with a friend, Darren Carey. Carey[1] said that he arrived at the defendant's home sometime after midnight on July 24, 1982. When Carey arrived, the defendant showed him a pair of car speakers which the defendant stated that he had taken "from a car up the street." The defendant also produced a gun which he said he had stolen from the home of a police officer in Easton.[2] Carey stated that the weapon he had seen the defendant with was a black revolver with a brown handle. Shortly after Carey arrived at the defendant's home, the gun accidentally fired into the wall in the defendant's bedroom.

---

[1] Carey had immunity from prosecution. See G. L. c. 233, §§ 20C-20G (1984 ed.).

[2] The defendant also told Carey that he had stolen two other guns in addition to the one he showed Carey. The calibers of the three stolen weapons were .38, .22, and .357.

In the early morning hours, Carey stated that he and the defendant went into the garage of a residence near the defendant's home. There they found barbells and weights, which they decided to steal. The two men removed the weights to nearby woods. While Carey continued this process, the defendant went across the street and broke into two cars. Carey did not see the defendant steal anything from these cars. Shortly thereafter, Carey and the defendant went into the garage of the victims' residence. Carey stated that the defendant tried to open a window at the front of the house. Carey told the defendant that there were people inside. According to Carey, the defendant stated that only one old man lived in the house. The defendant then made a punching motion and said, "One . . . and he's out."

The two men parted and Carey started toward his own home. He changed his mind and headed back to the hiding place and began assembling the weights. As he was assembling the weights, Carey saw the defendant walking up the street in the general direction of the victims' home. Carey left the woods with the weights and went in the opposite direction from that which the defendant had taken.[3]

At approximately 11:15 A.M. on July 24, 1982, victim King's son in-law arrived at the victims' home. The son-in-law testified that he found King lying face up in her blood-stained bed. The contents of her bureau drawers were strewn about the room. King was still alive at this time. The son-in-law then entered the bedroom of Lucey and found no apparent signs of life. The contents of Lucey's bureau drawers were also strewn about his room. When the police and ambulance arrived, King was taken to a local hospital. King died shortly after her arrival at the hospital.

1. *Motion to suppress the incriminating statements.* Thirteen months after the murders, on August 25, 1983, the defendant and a friend were arrested in an apartment complex in Stoughton

---

[3] Neighbors' testimony and the physical evidence corroborated several aspects of Carey's testimony.

The defendant presented evidence from his family which would tend to support his alibi that he was home asleep on the night of the murders.

and charged with disorderly conduct. The two men had consumed a substantial quantity of alcohol. A Stoughton police officer transported the two men to the police station and the reasons stated on the booking sheet for the defendant's arrest were disorderly conduct, being a minor in possession of alcohol and a controlled substance, and protective custody.[4]

During the booking, the defendant saw State Trooper Robert Murphy, an individual whom the defendant recognized as involved in the murder investigation.[5] Murphy was not on duty that evening. When the defendant saw Murphy, he called out that he wanted to talk to Murphy. Murphy responded that he would speak to the defendant later and left the booking area. The defendant called to Murphy to remind him not to leave the station without talking to him (the defendant).

After being booked, the defendant made two telephone calls. He then met with Murphy. Murphy recited the Miranda warnings for a second time and the defendant said that he understood the warnings. Murphy then asked the defendant what he wanted to talk to him about. In the ensuing conversation, the defendant made some damaging remarks. The defendant stated: "[Y]ou've been following me and my friends. You think I killed those people. I didn't kill those people." The defendant told Murphy that he was home asleep on the night of the murders. The defendant further stated that he would have told the trooper earlier, but his lawyer in the firearms matter had advised him not to speak to Murphy. The defendant also said that he was aware that the police were searching for the gun and stated that the police would not be able to find the gun without his help. The defendant then said that the gun they were searching for was a "Three, Five, Seven." The defendant also told Murphy that, although Murphy might know what

---

[4] At the time of this disorderly conduct arrest, the defendant was seventeen years old. At the station, his status was as an individual in protective custody.

[5] The defendant recognized Trooper Murphy because he had arrested the defendant on firearms charges in August, 1982. See G. L. c. 269, § 10 (1984 ed.). The defendant was prosecuted for unlawful possession of .38 and .22 caliber revolvers. These guns were stolen from the residence of an Easton police officer. The defendant was incarcerated for these convictions from August, 1982, until June 16, 1983.

happened, the police could not prove anything. Finally, the defendant said that on the day after the murders he told his sister and girl friend that he had heard that "50G's" had been stolen from the house and that he wished he had made the "hit."

Prior to trial, the defendant moved to suppress those statements. In his motion, the defendant asserted that because of his youth[6] and intoxication, he made these statements without a knowing and voluntary waiver of his rights. The defendant also argued that the police action violated his right to counsel under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights because Murphy knew the defendant had been represented by counsel on the firearms charges the year before. Finally, the defendant claimed that the police violated the protective custody statute, see G. L. c. 111B, §§ 8 and 10 (1984 ed.), and as a result his statements should be suppressed. The judge denied the motions. The defendant claims error in that denial.

The judge made the following findings of fact. At the police station, the police recited the Miranda warnings on at least two occasions. *Miranda* v. *Arizona,* 384 U.S. 436 (1966). The defendant said that he understood those warnings. The judge found that, even though he had been drinking earlier that evening, the defendant understood the warnings. The police also informed the defendant of his right to take a breathalyzer examination. See G. L. c. 111B, § 8. The defendant declined to do so. The judge further found that the defendant initiated the conversation with Murphy.[7]

---

[6] The defendant was seventeen years old at the time of this arrest. But, at the time of the murders, the defendant was sixteen years old. Thus, delinquency complaints were originally brought against the defendant. After transfer proceedings, it was determined that the defendant's case should be bound over to the Superior Court and the juvenile complaints were dismissed. See G. L. c. 119, § 61 (1984 ed.). *Two Juveniles* v. *Commonwealth,* 381 Mass. 736 (1980). There is no argument that it was error to transfer the case. Issues not argued are deemed waived. *Commonwealth* v. *Cundriff,* 382 Mass. 137, 150 n.22 (1980), cert. denied, 451 U.S. 973 (1981). See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

[7] According to the findings, Murphy was at the police station on a social visit and was not involved in the defendant's arrest. The judge found that Trooper Murphy had a longstanding practice to visit with officers at the

The judge found that, after being advised of his right to make a telephone call, the defendant made two telephone calls to a friend's mother. See G. L. c. 111B, § 8; G. L. c. 276, § 33A (1984 ed.). The judge found that the defendant made those telephone calls without any assistance. During the course of the defendant's booking, the defendant's family learned of his arrest. The judge found that the defendant's sister was present at the arrest and that his friend's mother had telephoned the defendant's mother to inform her of his status and whereabouts.

As to the defendant's degree of intoxication, the judge found that, while the defendant appeared glassy-eyed and smelled of alcohol, he had no difficulty walking or speaking. The defendant had no difficulty understanding questions concerning his address, age, telephone number, and mother's maiden name. The judge found that he answered all questions appropriately.

Initially, the defendant argues that his degree of intoxication precludes a conclusion that he voluntarily and knowingly waived the constitutional rights protected by the Miranda warnings. Special care must be taken in assessing a waiver and the voluntariness of the statements where there is evidence that the defendant was under the influence of alcohol or drugs. An otherwise voluntary act is not necessarily rendered involuntary simply because an individual has been drinking or using drugs. *Commonwealth* v. *Doucette*, 391 Mass. 443, 448 (1984). *Commonwealth* v. *Parham,* 390 Mass. 833, 839 (1984).

The details of the booking procedure and the circumstances of the defendant's statement do not support his contention that his waiver was involuntary. The officers who saw the defendant that night concluded that, although he had been drinking, he was not drunk. Although the defendant asserted that he was so drunk that he was unable to waive his rights, the judge

Stoughton police station. On this particular evening, the judge found that Murphy had been working in Sharon until about 10:30 P.M. Murphy then stopped for coffee at a doughnut shop, visited with a friend, and proceeded to the Stoughton police station.

could disbelieve his testimony.[8] Credibility is for the fact finder. *Commonwealth* v. *Santo*, 375 Mass. 299, 303 (1978). We do not substitute our judgment for that of the trial judge, who heard and saw the witnesses. *Commonwealth* v. *Fernette*, 398 Mass. 658, 663 nn. 9 & 10 (1986).

We also find no merit in the defendant's contention that his youth and low intelligence precluded a voluntary waiver. "It is well settled that a minor may waive his constitutional rights and make an incriminating statement to the police that is admissible against him" (citations omitted). *Commonwealth* v. *Williams*, 388 Mass. 846, 851 (1983). See *Commonwealth* v. *Tavares*, 385 Mass. 140, 146, cert. denied, 457 U.S. 1137 (1982); *Commonwealth* v. *Daniels*, 366 Mass. 601, 605 (1975). The defendant was age seventeen, eleven months. The defendant had had at least one prior arrest. He was twice given Miranda warnings. He decided to waive his rights and take the opportunity to offer an alibi. Further, the defendant initiated the conversation with Murphy. The police officers did not seek to obtain information from the defendant. There is no evidence that the police employed any unfair tactics to prompt the defendant to incriminate himself. We conclude that the judge correctly determined that the Commonwealth met its burden of proving that the defendant validly waived the rights protected by the Miranda warnings and that his statements were made voluntarily. See *Commonwealth* v. *Tavares, supra* at 152.

As to the defendant's contention that his right to counsel was violated, the defendant did not invoke his right to counsel

---

[8] The defendant relies heavily on *Commonwealth* v. *Hosey*, 368 Mass. 571 (1975), and *Commonwealth* v. *Meehan*, 377 Mass. 552 (1979), cert. dismissed, 445 U.S. 39 (1980). Those cases are inapposite. In *Hosey*, the officer testified that the defendant was extremely "high" and emotional. The officer had difficulty making sense of the defendant's statements. *Id.* at 575. On these facts, the *Hosey* court stated that it could not "condone an attempt to induce a waiver in this manner." *Hosey, supra* at 578. The defendant here did not suffer the same mental and physical impairment as the defendant in *Hosey*.

In *Meehan, supra* at 567, the court suppressed statements made as a result of the defendant's intoxication and youth, and the failure of the police to permit the defendant to make a telephone call. This combination of factors lead the court to conclude that suppression was appropriate.

after receiving the Miranda warnings. See *Commonwealth* v. *Pennellatore*, 392 Mass. 382, 387 (1984). The judge found that, although the defendant had counsel on the firearms charge, there was no evidence that this representation extended beyond the firearms charge. There was no error.

The defendant's final argument concerning the incriminating statements involves the violation of the protective custody statute, G. L. c. 111B, §§ 8 and 10.[9] After the defendant was placed in protective custody, the police did not telephone either of his parents to state that he was in protective custody. Nonetheless, the defendant concedes that his mother had notice of his protective custody booking shortly after it occurred.

According to the mother, she telephoned the police station between 1:30 A.M. and 2 A.M. and requested the release of her son.[10] The officer informed her that she could not pick up her son because he was being held in protective custody. This statement was misinformation conveyed to the mother in conflict with the provisions of G. L. c. 111B, § 10. The judge ruled that even if the officer told the defendant's mother not

---

[9] In relevant part, G. L. c. 111B, § 8, provides: "Any person who is incapacitated may be assisted by a police officer with or without his consent to his residence, to a facility or to a police station. To determine for purposes of this chapter only, whether or not such person is intoxicated, the police officer may request the person to submit to reasonable tests of coordination, coherency of speech, and breath.

"Any person assisted by a police officer to a police station shall have the right, and be informed in writing of said right, to request and be administered a breathalyzer test. . . .

"Any person presumed intoxicated and to be held in protective custody at a police station shall, immediately after such presumption, have the right and be informed of said right to make one phone call at his own expense and on his own behalf. . . . The parent or guardian of any person, under the age of eighteen, to be held in protective custody at a police station shall be notified forthwith upon his arrival at said station or as soon as possible thereafter."

In relevant part, G. L. c. 111B, § 10, provides: "Any person under the age of eighteen who is . . . held in protective custody at a police station pursuant to section eight shall, upon request of his parent or guardian, be released to the custody of said parent or guardian."

[10] The judge made no findings as to the time of the violation, but the mother's testimony indicates that she sought to obtain custody of the defendant between approximately 1:30 A.M. and 2 A.M.

to come to the police station, the defendant's statements were made voluntarily after waiver of his rights and should not be suppressed at trial. We agree.

An unlawful arrest does not compel suppression of statements not related to the unlawful arrest. *Commonwealth* v. *LeBlanc*, 373 Mass. 478, 487 (1977). So too, improper conduct unrelated to the statements does not compel suppression of the statements. While the initial arrest and protective custody were lawful, the subsequent conduct of the police in misinforming the defendant's mother as to whether the defendant could be released was improper. Thus, the issue is whether that illegality requires suppression of the statements. We think not.

In *Brown* v. *Illinois*, 422 U.S. 590 (1975), and *Dunaway* v. *New York*, 442 U.S. 200 (1979), the Supreme Court stated that the important factors to be analyzed in the determination of the admissibility of statements made following an illegal arrest are: (1) Miranda warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the police misconduct. *Brown* v. *Illinois, supra* at 603-604. See, e.g., *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 258 (1982); *Commonwealth* v. *Sylvia*, 380 Mass. 180, 183 (1980). We turn to the defendant's statements with these factors in mind.

The police informed the defendant of the Miranda warnings on at least two occasions. The temporal proximity between the protective custody booking and the statements was fairly close. The police arrested the defendant at approximately 12:30 A.M. The booking process was fairly brief and, according to the record, the defendant telephoned his friend's mother about 12:40 A.M. The conversation with Murphy occurred shortly after this telephone call, and lasted for, at most, one-half hour. Thus, the time between the arrest and the statements was about forty-five minutes. The most crucial intervening circumstance was the presence of Murphy at the station, see note 7, *supra*, and the defendant's insistence on speaking with him.[11] Finally,

[11] As we read the record, the illegality alleged by the defendant had not yet occurred. The statutory violation occurred sometime between 1:30 A.M. and 2 A.M., according to the mother's testimony, when the police told the

the police did not attempt to exploit the circumstances of the arrest. The statutory violation was not a deliberate one aimed at encouraging the defendant to incriminate himself. There appears to be no causal relationship between the statement and the subsequent detention. "In these circumstances, outlawing [the defendant's] statement[s] would hardly have served an important demonstrative purpose of deterring the police from future malfeasance." *Commonwealth* v. *Sylvia, supra* at 184.

2. *Motion to suppress the identification evidence.* Prior to trial, the defendant moved to suppress two different forms of identification evidence. The defendant sought to suppress evidence of a jewelry store employee's identification of his photograph. The defendant also filed a motion to suppress the identification of a picture of a weapon which the Commonwealth's witness, Carey, stated looked similar to the weapon he had seen in the defendant's bedroom on the night of the murders. The judge denied both motions. There was no error in the judge's rulings.

On September 29, 1983, a detective from the Stoughton police department went to a local jewelry store and showed an employee a piece of paper with photographs of two different individuals and a list of stolen items. This employee immediately recognized the photograph of the defendant. The employee also recalled some of the items that the defendant had sold to her. The employee said that the defendant came into her store several times in August and September, 1983. She had purchased from the defendant three silhouette charms, two of female heads and one of a male head, a watch case, a pearl ring, two pearl earrings, and a pearl clasp.

The defendant contends that the identification procedure was impermissibly suggestive and that the use of a photograph of the defendant, taken in connection with a prior juvenile matter, violated the statutory protections given juveniles.[12] At trial,

---

defendant's mother over the telephone that they would not release the defendant. The defendant's statements were made before this improper police conduct. We do not rely on this time sequence because the judge did not make any findings as to the time these events occurred.

[12] This identification occurred two months before delinquency complaints were brought against the defendant.

the defendant argued that G. L. c. 119, § 60A (1984 ed.), prohibited police use of the defendant's photograph. The defendant did not argue, however, that the police lacked the authority under G. L. c. 263, § 1A (1984 ed.), to photograph juveniles arrested for the equivalent of a felony but charged with delinquency. He makes both arguments on appeal. As to the defendant's contention that G. L. c. 119, § 60A, prohibits police use of his photograph, a reading of the statute does not support the defendant's contention. As to the defendant's contention that the police lack authority to photograph a juvenile charged with the equivalent of a felony, we consider the statute to determine whether a substantial likelihood of a miscarriage of justice has occurred. G. L. c. 278, § 33E.

The judge found that the jewelry store employee had seen the defendant on four or five occasions over a six-week period. The employee saw the defendant under lighting that existed in the store. The judge did not find the procedure employed by the police to be suggestive. In the totality of circumstances, the judge concluded that the employee was able to make a credible identification.

The jewelry store employee's identification of the defendant occurred during the police investigation of the homicides. Because certain jewelry had been stolen from the victims, the police circulated information with photographs of two suspects and a list of the stolen items to precious metal dealers in the area. In presenting the material to the jewelry store employee, the officer simply asked whether she recognized either individual. He did not seek to influence her choice in any way. We agree with the judge that this identification was not so suggestive as to give rise to a substantial likelihood of misidentification. See *Commonwealth* v. *Botelho*, 369 Mass. 860 (1979).

As to the defendant's second challenge to the identification, the use of his photograph taken as a result of a prior juvenile proceeding, the judge determined that G. L. c. 119, § 60A,[13]

---

[13] General Laws c. 119, § 60A, provides: "The records of the court, including those of a juvenile appeals session, in all cases of delinquency arising under sections fifty-two to fifty-nine, inclusive, shall be withheld from public inspection except with the consent of a justice of such court, but such records in any such case against any particular child shall be open,

did not prohibit police use of this photograph. The judge concluded that the statute applied to court proceedings and was not applicable by its terms to police investigations, especially those occurring before arrest. Thus, he concluded that the use by police of the defendant's photograph during the murder investigations did not give rise to a § 60A violation. We conclude that the judge correctly ruled the statute by its terms does not apply to police investigations.

On appeal, the defendant argues that the police do not have the authority to photograph juveniles arrested on a charge which would be a felony if the offender were an adult. Under G. L. c. 263, § 1A (1984 ed.), the police are empowered to fingerprint and photograph anyone who is taken into custody and charged with a felony. See G. L. c. 274, § 1 (1984 ed.). A juvenile who is arrested for the commission of the equivalent of a felony may be charged only with delinquency. See G. L. c. 119, §§ 53, 54 (1984 ed.). Therefore, the defendant argues that G. L. c. 263, § 1A, by its terms, is inapplicable to individuals charged with delinquency. Thus, he concludes that the police lack authority to photograph or fingerprint any person who is arrested and charged with delinquency pursuant to G. L. c. 119, § 54. We do not agree.

In *Police Comm'r of Boston* v. *Municipal Court of the Dorchester Dist.*, 374 Mass. 640, 647 (1978), we left open the question whether the statutory authority to photograph and fingerprint individuals charged with a felony includes juveniles arrested for the equivalent of a felony but charged with delinquency.[14] Nevertheless, we recognized in *Police Comm'r of Boston, supra* at 655, that "[t]he maintenance of fingerprint, photograph and arrest records serves an important law enforcement function." The Legislature did not explicitly exclude juveniles from G. L. c. 263, § 1A. Thus, we construe G. L. c. 263, § 1A, to include an individual who is arrested for an

at all reasonable times, to the inspection of the child, his or her parent or parents, guardian and attorney, or any of them."

[14] The juvenile in *Police Comm'r of Boston* did not argue that the police lacked the authority to fingerprint and photograph juveniles, therefore we did not consider the issue. *Id.* at 647.

offense classified as a felony but who is later charged with delinquency because of age.[15] See *Monroe* v. *Tielsch,* 84 Wash. 2d 217 (1974).

The defendant also challenges testimony by Darren Carey that the gun he had seen in the defendant's bedroom on the night of the murders resembled a picture of a gun which an investigating officer had shown him. Carey was shown pictures of four guns, all of which were either .38 or .357 caliber weapons. The defendant contends that the officer's action, in opening up a book with pictures of guns to a particular page, was unnecessarily suggestive. We disagree. The officer's action in directing Carey's attention to a particular page of a book did not result in a prejudicial and unreliable identification of the gun. Defense counsel had the opportunity to bring out the weakness of the identification of the gun on cross-examination. See *Commonwealth* v. *Simmons,* 383 Mass. 46, 52 (1981). The judge correctly ruled that any infirmities of this identification evidence went to the weight, not the admissibility, of Carey's testimony.[16] See *id.* at 51.

3. *Motion to suppress the results of scientific tests.* The Commonwealth performed destructive chemical testing on the three charms which were recovered from the jewelry store.[17]

---

[15] Some States have passed legislation regarding police authority to photograph juveniles and police authority to use their records during an investigation. See, e.g., N.J. Stat. Ann. § 2A: 4A-61 (West. Supp. 1986); 42 Pa. Cons. Stat. Ann. § 6308(c) (1982); Wash. Rev. Code § 13.04.130 (1985).

[16] The defendant also challenges the admission of evidence seized pursuant to a search warrant executed on the same day the defendant was arrested on the firearms charges. See note 5, *supra.* In this trial, the defendant claims that the arrest on the firearms charge was a pretext. This he cannot do. The defendant's challenge amounts to a collateral attack on a prior arrest. Any question concerning the validity of this prior arrest was appropriate only during the prior proceedings. We note that there is nothing in the record to show that the defendant challenged the validity of the arrest in the prior proceedings.

[17] In addition to the three charms, other pieces of the jewelry similar to the victim's were recovered at this jewelry store. The jewelry store employee stated that she had purchased a watch back or case, a pearl ring, two pearl earrings, and a pearl clasp from the defendant. The victim's daughter testified that items such as a diamond necklace, a pearl ring, and a man's

The daughter of one of the victims identified these charms as belonging to her mother. The daughter stated that she had given these three charms to her mother with her name and birth date engraved on one female silhouette. Her children's names and birth dates were engraved on the other two silhouette charms. When the charms were recovered at the jewelry store, the surface of the charms had been filed or ground down so that any engraving was not legible.

A chemist for the Commonwealth attempted to restore any markings which may have been on the charms by applying different acid solutions to the surface of the charms. On the male silhouette charm, the chemist observed a number five or six followed by the number one on the right side of the charm. On the second charm, the chemist observed no markings after applications of the chemical solution. On the third charm, the chemist noted on the left side of the charm the number nine, and the number six. These numbers corresponded to some of the numbers in the birth dates of the children, and so corroborated the daughter's identification of the charms as those of her mother.

The markings that were exposed by the testing were visible for approximately two hours. They then disappeared completely. The chemist made notes of his observations at each stage of the test. The chemist also prepared a report containing the results of this testing. Finally, the chemist made sketches to record what he had observed. He did not, however, photograph any of the steps of the testing procedure.

The defendant argues that the admission of the results of these tests, where the testing procedure destroyed the evidence in the process of testing, violates his right to due process. After an evidentiary hearing, the judge found that this testing was done before the defendant had been arrested. Therefore, there was no lawyer to whom notice could have been given concerning the testing. The judge also found that nondestructive testing

---

watch were missing. At the jewelry store and at trial, the daughter was able to identify the watch back as belonging to her mother. The watch had been given to the victim by a friend and was engraved with the name "Bill." This engraving was visible and legible despite the scraping on the watch.

was not an alternative in this case. According to both the Commonwealth and the defense experts, all the available testing methods involved some reduction of the surface of the metal. Although the judge concluded that photographs of the test procedure would have provided a better record, the chemist's report was made available to the defendant. The judge did not find the absence of photographs to be fatal to admissibility, thus he denied the motion to suppress the test results.

Due process requires that the prosecution disclose to a defendant, on request, evidence in its possession that is material either to guilt or to punishment. *California* v. *Trombetta*, 467 U.S. 479, 485 (1984). *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963). *Commonwealth* v. *Liebman*, 388 Mass. 483, 487 (1983). This obligation includes "evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Commonwealth* v. *Ellison*, 376 Mass. 1, 22 (1978). Obviously, in the case of destructive testing, the prosecution no longer has the evidence in its possession, but that is not dispositive of the issue of the Commonwealth's obligation to disclose exculpatory evidence. "Otherwise, disclosure might be avoided by destroying vital evidence before prosecution begins or before defendants hear of its existence." *United States* v. *Bryant*, 439 F.2d 642, 651 (D.C. Cir. 1971).

In cases where potentially exculpatory evidence has been lost or destroyed, courts have employed a balancing test, weighing the culpability of the government, the materiality of the evidence, and the potential prejudice to the defendant to determine the necessity or appropriateness of sanctions or other remedial action. See *Commonwealth* v. *Charles*, 397 Mass. 1, 14 (1986); *Commonwealth* v. *Walker*, 14 Mass. App. Ct. 544, 547-548 (1982). See, e.g., *United States* v. *Arra*, 630 F.2d 836, 848 (1st Cir. 1980); *United States* v. *Wilks*, 629 F.2d 669, 674 (10th Cir. 1980); *United States* v. *Herndon*, 536 F.2d 1027, 1029 (5th Cir. 1976); *United States* v. *Bryant, supra* at 653.

In assessing the culpability of the government in this case, the judge's findings reveal that the Commonwealth's expert knew of no test procedures which were nondestructive. The defendant's expert suggested that polishing the surface of the metal might remove the scrapings and reveal the engraving underneath. But, if this polishing technique were not successful, the defendant's expert conceded that the application of chemicals to reveal the engraving would involve a reduction of the surface of the metal.[18] Compare *United States* v. *Beltempo*, 675 F.2d 472, 479 (2d Cir.), cert. denied, 457 U.S. 1135 (1982) (good faith loss which came about as a necessary consequence of the testing method used).

Any culpability of the Commonwealth arises in the failure to photograph each step of the test procedure. Because there had been no indictment or arrest in connection with the murders, the defendant did not have an attorney or an expert who could be notified concerning the testing. In this setting, the better practice would have involved careful documentation and photographing of the entire test. See, e.g., *United States* v. *Bridges*, 499 F.2d 179, 185 (7th Cir.), cert. denied, 419 U.S. 1010 (1974); *United States* v. *Shafer*, 445 F.2d 579, 582 (7th Cir.), cert. denied, 404 U.S. 986 (1971); *State* v. *Carlson*, 267 N.W.2d 170, 175 n.4 (Minn. 1978).                    .

Against this failure of the government to photograph the test procedure, we balance the materiality of the evidence and the potential prejudice to the defendant. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States* v. *Agurs*, 427 U.S. 97, 109-110 (1976). See generally *Commonwealth* v. *Gilday*, 382 Mass. 166, 178-179 (1980); *Commonwealth* v. *Ellison*, 376 Mass. 1, 23-25 (1978). It seems clear that if the defendant had had the ability to perform tests on the charms which revealed numbers or letters not included

---

[18] The defendant's expert also indicated that the chemical process which destroyed the surface of the charms could have been halted prior to the complete disappearance of the engraving.

in the names and birthdates engraved on the charms of the victim, the evidence would have been material. But, even if that had occurred, those test results would not have proved that the defendant did not commit the murders. Cf. *Commonwealth* v. *Preziosi, ante* 748, 752 (1987). The victim's daughter also had identified at the jewelry store the watch back with the name "Bill" engraved on it as belonging to her mother. The defendant had sold this item to the jewelry store along with the charms. Additionally, the daughter was able to identify her mother's watch band which the defendant had sold because it had some distinctive broken places in the basketweave mesh of the band. The daughter also stated that some pearl jewelry belonging to her mother was missing. The jewelry store employee had purchased various pieces of pearl jewelry from the defendant, but, given that the daughter looked at over one hundred pieces of jewelry at the jewelry store, she was not able positively to identify this jewelry. Regardless of any defense testing on the charms, the testimony regarding the other jewelry clearly was probative of the defendant's guilt. Cf. *Commonwealth* v. *Preziosi, supra* (failure to test for fingerprints does not relate directly to guilt or innocence); *Wilks, supra* at 675 (missing evidence, rendering test for defendant's fingerprints impossible, could not have proved innocence). Error, if any, was nonprejudicial in view of the other evidence connecting the defendant to the sale of the jewelry similar to that stolen from the victim.

4. *The motion for a mistrial.* On the sixth day of trial, Trooper Murphy testified to the details of the police investigation of the homicides. On cross-examination, the defendant brought out several deficiencies in the police investigation. In particular, the defendant opened up the subject of the items recovered by the police pursuant to three search warrants. The police had recovered relevant evidence as a result of the first search warrant,[19] but the other two searches did not produce items which pertained to the case.

---

[19] In this search, the police seized a section of wall paneling and a wooden stud from the defendant's bedroom with a hole that appeared to be the result of a gun shot.

In redirect examination, the prosecutor sought to rehabilitate his witness by clarifying that the police did recover some items pursuant to the third search warrant. The trooper said, over objection, that in the third search of the defendant's bedroom he found a bag containing forty to fifty pieces of silver jewelry. The judge ruled that, because the defendant had opened up the subject of the warrants, the trooper could testify as to what was found. After the trooper then stated that the jewelry was unrelated to this case, the judge requested a bench conference with the parties and reprimanded the prosecutor for introducing evidence which might suggest other crimes.[20] The defendant then moved for a mistrial. The judge denied this motion. The defendant did not move to strike this testimony. In addition, the record reflects that the defendant did not seek a curative instruction.

The prosecutor should not have allowed the witness to make this reference to jewelry unrelated to the case.[21] The suggestion of other crimes was so vague and the evidence inculpating the defendant so strong that, on balance, we conclude that this did not taint the defendant's trial and thus reversal of the convictions is not required.

5. *Prosecutorial misconduct.* The defendant challenges one remark made by the prosecutor concerning the qualifications of the defendant's expert. The defendant also asserts that he was unfairly prejudiced by two statements of the prosecutor during his closing argument. We find no merit in these contentions.

---

[20] The judge stated that he thought "it was grossly improper to introduce this evidence knowing it had no bearing."

[21] We note that the testimony concerning a bag of jewelry was never mentioned again by the Commonwealth in the course of the nine-day trial. There was never any connection made between this bag of jewelry and any criminal activity. See, e.g., *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-226 (1986); *Commonwealth* v. *King*, 387 Mass. 464, 468-472 (1982). Cf. *Commonwealth* v. *Welcome*, 348 Mass. 68, 70 (1964).

The defendant's mother testified that the defendant's grandmother had given the defendant several pieces of jewelry shortly before she died, thus presenting the jury with an explanation for the presence of jewelry in the defendant's bedroom.

A metallurgist testified on behalf of the defendant. After he testified to his qualifications in his field of expertise, the prosecutor objected. In front of the jury, the prosecutor stated that it was unclear whether the expert had two years of high school or elementary school training in chemistry. The defendant objected to the prosecutor's disparaging remarks in front of the jury. The judge promptly corrected the prosecutor's improper remark by instructing the jury that the statement was inappropriate and that the objection was simply to the lack of qualifications.[22] While it was unfortunate that the prosecutor made this improper comment in front of the jury, the judge promptly and forcefully corrected this misstatement. Any possible harm was eliminated promptly by the judge. See *Commonwealth* v. *Eagan*, 357 Mass. 585, 592 (1970). See also *Commonwealth* v. *Fernette*, 398 Mass. 658, 665-666 (1986).

Prior to the closing arguments in this case, the prosecutor indicated to the judge that he sought an instruction on the theory of murder with extreme cruelty or atrocity. The record reflects that the judge did not indicate to the parties whether he would give an instruction on this theory of murder in the first degree until after the prosecutor's closing argument. See Mass. R. Crim. P. 24 (b), 378 Mass. 895 (1979). Thus, the prosecutor argued this theory of murder in his closing statement.

At the conclusion of the prosecutor's closing statement, the judge indicated to the parties that, although these crimes were certainly vicious, he did not believe it was appropriate to instruct the jury on the extreme atrocity or cruelty theory of murder in the first degree. The defendant requested that the judge give an instruction to "sanitize" the prosecutor's remarks on this theory of murder. In his instructions, the judge explained to the jury that, although the prosecutor had argued the atrocity or cruelty theory of murder, it was "not a proper principle" for the jury to consider in connection with murder in the first degree. At the conclusion of the instructions, the defendant

---

[22] The prosecutor's objection was overruled and the witness was permitted to testify as an expert.

raised no objection to the judge's handling of this issue. There was no error in the prosecutor's summation.[23]

Because the judge had not informed the parties whether he would submit the case to the jury on this theory of murder, there was no prosecutorial misconduct in arguing to the jury the evidence and asserting that from this evidence the jurors could conclude that the murders were committed with atrocity or cruelty. "We have never criticized a prosecutor for arguing forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence." *Commonwealth* v. *Kozec, ante* 514, 516 (1987). Here, the prosecutor's argument was properly based on the physical evidence and inferences drawn from that evidence. While some of this argument was graphic and unpleasant, as the judge noted, this was an extremely vicious crime. The argument was based on the evidence.

6. *Review pursuant to G. L. c. 278, § 33E.* Pursuant to our duty under G. L. c. 278, § 33E, we have reviewed the record and conclude that there is no reason to order entry of a verdict of lesser degree of guilt or a new trial on the convictions of murder in the first degree. The defendant suggests that the sentences on the two murder convictions should run concurrently. See *Commonwealth* v. *Stewart*, 375 Mass. 380, 390-393 (1978) ("same evidence rule"). Because there were two murders, there is no merit in this contention.

*Judgments affirmed.*

---

[23] Pursuant to G. L. c. 278, § 33E, we considerèd whether the judge's late ruling regarding the first degree murder instructions created a substantial likelihood of a miscarriage of justice. We conclude that it did not. The prosecutor stayed within the evidence and the jurors were not misled as to what was necessary to support verdicts of murder in the first degree.