COMMONWEALTH vs. BARBARA A. CAMERON.

No. 87-138.

Middlesex.  June 8, 1987. — March 30, 1988.

Present: BROWN, PERRETTA, & FINE, JJ.

*Practice, Criminal,* Disclosure of evidence, Preservation of evidence, Dis-
missal. *Motor Vehicle,* Operating under the influence. *Due Process of
Law,* Disclosure of evidence. *Evidence,* Exculpatory, Videotape, Rele-
vancy and materiality.

Where, at the trial of a complaint charging the defendant with operating a
motor vehicle while under the influence of intoxicating liquor, the record
indicated that a lost or destroyed videotape recording of the defendant
at the police station as she was being booked was potentially exculpatory;
that, even if there was no evidence of bad faith on the part of the
Commonwealth as the judge so found, there was nonetheless ample
evidence of the Commonwealth's culpability by reason of negligence
or inadvertence; and that, in view of the evidence presented, the videotape
would have been material to the defendant's case and its loss was sub-
stantially prejudicial to her, it was error requiring reversal for the judge
to refuse to allow the defendant to question or comment upon the Com-
monwealth's failure to produce the videotape, even though the cir-
cumstances did not warrant dismissal of the complaint with prejudice.
[545-549]

COMPLAINT received and sworn to in the Concord Division
of the District Court Department on February 10, 1986.

On transfer to the jury session of the Framingham Division,
a motion to dismiss the complaint was heard by *Joseph D.
Clancy,* J., and the case was tried before him.

*Robert F. Casey (Jerome L. Benson* with him) for the defend-
ant.

*Marie L. Blasko,* Assistant District Attorney, for the Com-
monwealth.

PERRETTA, J. On the night of January 10, 1986, the defendant
was stopped, arrested, and brought to the Acton police station

on charges of operating a motor vehicle while under the influence of liquor and failing to stay within marked lanes.[1] At the police station the desk officer turned on the overhead camera and videotaped the defendant as she was being booked. In preparation for trial, the defendant requested her videotape. The Commonwealth advised that it did not exist. Her numerous requests for an explanation of its loss were ignored until the morning of her trial, immediately before which there was an evidentiary hearing on her motion to dismiss the charge on the ground that the Commonwealth had lost exculpatory evidence. The motion was filed nine days prior to trial, along with defense counsel's affidavit describing how the Commonwealth had ignored his numerous demands for an explanation of how it had lost the videotape. Notwithstanding the facts set out in the affidavit and the ample time to make appropriate explanation, the Commonwealth's only answer was the prosecutor's hearsay testimony that the videotape was blank and that, therefore, the camera had "malfunctioned." The judge found that there was no evidence of bad faith on the part of the Commonwealth and denied the motion. The judge also ruled, at trial, that the defendant could ask no questions concerning the existence of a videocamera at the police station and the loss of the videotape. The only evidence at trial was the conflicting testimony of the officers and the defendant. As seen from the verdicts, the jury believed the officers. We conclude that the defendant was denied a fair trial and reverse.

I. *The Evidence at Trial.*

Raymond LaRoche testified that at about 11:50 P.M. on January 10, 1986, he was in his cruiser patrolling along Route 2 near the Route 111 intersection in Acton. He noticed that, as the defendant drove, she was "swaying from the travel lane to the passing lane back and forth approximately four times" without using her directional signals. She was driving at about twenty-five or thirty miles an hour in a zone which allowed for

---

[1] As the defendant's conviction on the latter charge was placed on file without objection by her, the appeal therefrom is not properly before us. Were it here, we would affirm on the basis of her testimony.

a speed of forty-five miles an hour. LaRoche followed her for about a quarter of a mile. As they approached the Route 111 left exit ramp, the defendant drove from the right travel lane over to the exit. LaRoche "immediately activated" his blue lights and siren. The defendant did not stop until some one to two hundred yards later "in front of an apartment complex." She pulled into the complex parking lot "off to the side of the road."

When LaRoche asked the defendant for her license and registration, she "fumbled through everything." It took her a "while"· to find her license, and she could not produce her registration. LaRoche asked her why she was having a problem "navigating" her car and she replied that LaRoche should know, that she had been drinking again, as if LaRoche "knew her or something." LaRoche had "never met her before."

LaRoche had his flashlight on and could see the defendant very well. He "noticed her eyes to be very bloodshot and glassy . . . [a]nd her speech was heavily slurred." He asked her to get out of the car, and when she did so, LaRoche had to hold her up by her arm to "get her away from the roadway to further check her, for the fear of her possibly falling into the traffic, whatever." As he talked with her he smelled a "strong odor of alcohol coming from her breath . . . [a]nd again, very unsteady on her feet." At that point, LaRoche concluded that she was "heavily under the influence of intoxicating liquor" and arrested her. He handcuffed her and walked her to the cruiser, "holding her arm the whole time to make sure she didn't fall over."

On cross-examination, LaRoche was asked to draw a diagram on a blackboard tracing the route of the defendant's travel. Because the questions concerning the diagram were asked with little regard for a reader of the trial transcript, we cannot describe the diagram drawn by LaRoche. All that we know is that the defendant's travel route involved a rotary, "No U Turn" and "No Left Turn" signs, "little cement buckets" with light reflectors used as barriers at various places, an overpass, and the exit ramp from Route 2 onto Route 111. The parking lot where the defendant pulled over was "[m]aybe 30

yards or so, not too far" from the Route 111 overpass of Route 2. Although the exit ramp was "very wide," there was no breakdown lane on the Route 2 exit ramp or the Route 111 overpass.

LaRoche stated that, although he usually conducts a field sobriety test consisting of the suspect walking an imaginary straight line, he did not do so with the defendant. He did not feel it would be safe because the defendant "could have fallen into the road and got hit by the car." He agreed that he "could have" gone to the parking lot on the other side of the vehicle. LaRoche could not remember what kind of shoes the defendant was wearing. When asked whether the defendant was "cooperative" with him, LaRoche answered "[n]ot necessarily."

James Cogan was the desk officer on duty when LaRoche arrived at the police station with the defendant. He was standing behind the "booking desk." Cogan did not see her walk into the station or over to the desk. However, as she stood at the counter, she was "sort of swaying back and forth." Her eyes were "extremely glassy," "watery and bloodshot," and she had an "extremely strong odor of alcohol on her breath." When Cogan asked her questions concerning her personal history, he frequently had to repeat the questions. The defendant "would just look at . . . [him] and not answer." It seemed to Cogan that the defendant "wasn't paying attention at times, although she was looking right at . . . [him]."

On cross-examination, Cogan stated that there is a straight line on the floor of the booking area for purposes of a sobriety test. However, when he is the booking officer, he never gives sobriety tests. As he could not see the defendant's feet, he could not say whether she was wearing boots.

According to the defendant, she went to the Marriott Hotel in Newton on the night in question to meet a former instructor and business associate who was arriving from California and was to stay at the hotel during his visit. They planned to meet for dinner at the hotel at about 7:00 P.M., but when the defendant checked at the front desk, he had not yet arrived. She left a message at the desk that she would be in the cocktail lounge. At about 7:45 P.M., she checked again. In the meantime, as she

waited, she got into a conversation with two men in the lounge. When her friend had not arrived by 8:30 P.M., she decided that he had missed his flight. She arranged to have her dinner, which required a wait of an hour. Throughout this time and at dinner, which she had with the men she had met, the defendant had four wine spritzers (white wine with soda and ice). She had a cup of coffee after dinner and left the hotel at about 11:00 P.M. The defendant, who lived in Concord and worked in Maynard, had arranged to spend the night with her sister in Leominster because she had an 8:00 A.M. meeting in Worcester.

Although the defendant knew her way to her sister's home from Route 2, her sister, knowing that it would be late, had given her directions for a quicker route with which the defendant was unfamiliar.[2] As she drove, the defendant changed lanes twice, trying to make up her mind which would be quicker, the way she knew or the route her sister had described. She elected the way she knew, Route 111. She had crossed to the passing lane to take the left exit off Route 2 onto Route 111 when she realized she was being signalled to stop. Because she did not want to stop on the ramp and because there was no breakdown lane, she continued until she thought that it would be safe to pull over.

When her license was not in her wallet, she searched through her purse and found it. The registration should have been in the glove compartment. She thought that the reason it wasn't there when she looked was because her three children use her car while at home from college during holiday and summer vacations.

Denying that she swayed or stumbled as she walked, the defendant stated that because there was snow and ice on the ground, she was wearing her boots, which were high-heeled. Although the walking was "difficult," she did not stumble. She denied that the four wine spritzers which she had consumed, as well as dinner and coffee, over the four-hour period at the hotel in any way influenced her ability to drive. She agreed that she did not give any signals on changing lanes, which

---

[2] "[T]ake Route 2 to 190 to Route 12."

she stated happened only two and not four times and which she attributed to her indecision as to the route she would take.

II. *The Lost Tape*.

We learn from the docket entries that the complaint was brought on January 13, that there was a pretrial conference on March 17, at which time trial was scheduled for May 21, that it was thereafter continued to June 13, and that the motion to dismiss and accompanying affidavit were filed on June 4. The following facts are taken from defense counsel's affidavit.

Because defense counsel knew it was standard procedure for the Acton police to videotape the booking process in arrests made for violations of G. L. c. 90, § 24(1)(*a*)(1), he asked for the videotape of the defendant's booking. The affidavit does not disclose the date of his request or to whom it was made. In any event, he was advised that the videotape could not be found. He relayed that fact to an assistant district attorney, whom we shall refer to as the first prosecutor. It was then mid-April, and the first prosecutor told defense counsel that he would look into the matter and get back to him with an explanation. On May 20, not having heard from the first prosecutor, defense counsel sought and obtained a continuance of the trial. His associate called the first prosecutor's office, leaving a message for him to call defense counsel. When the first prosecutor did not return the call, the associate called again the next day. On this call, the associate was informed that the first prosecutor was on vacation and that another specifically identified person, whom we shall refer to as the second prosecutor, would call him back and discuss the case.

After waiting a week to hear from the second prosecutor, the associate again called the prosecutor's office and was advised that another specifically identified prosecutor (the third) had been assigned to the case. The associate spoke with the third prosecutor, who advised him that she would call him the next day, May 29, with information concerning the videotape. When the third prosecutor did not call, calls were made to her, but they were not returned.

On June 2, defense counsel spoke with the first prosecutor and asked him about the videotape. The first prosecutor advised

defense counsel that he was no longer connected with the case. Defense counsel also spoke with the third prosecutor, who was either uninformed or forgetful of the trial date. When reminded of the videotape problem, the third prosecutor told defense counsel that she would get back to him. At this point, it seems almost needless to state that the third prosecutor never did "get back" to defense counsel.

A fourth prosecutor represented the Commonwealth at the evidentiary hearing on the motion and trial. He did not deny any of the allegations set out in defense counsel's affidavit. He called LaRoche to the stand, who recited the facts leading up to the defendant's arrival at the police station. Cogan was next, and he related that, when the defendant was brought to the counter, he turned on the overhead videocamera, pressed the "play/record" button, recited the date,[3] and then asked the defendant questions concerning her personal history. When he finished with his questions, he stopped the videotape, ejected it from the machine, and placed it with the paperwork relating to the defendant's arrest. This packet (the papers and the tape) "goes to the prosecutor or whatever." There had been no indication of a malfunction in the videocamera when Cogan was the operator. He had "no idea that there was any malfunction whatsoever." Cogan went on to add that he had been unaware of any problems with the machine "until just at this time this morning when I came in and they said that to me, I had no idea that there was a tape problem at all." Cogan had not seen or heard about the videotape from the night of the defendant's arrest until the time of his appearance for her trial.[4]

At the conclusion of Cogan's testimony, the judge asked the prosecutor whether the videotape itself was available. The prosecutor "imagine[d]" that the tape was available but that "it would be blank." The judge pressed the prosecutor as to whether he had made an attempt to "locate" the videotape. At

---

[3] We think it reasonable to infer from this act that the videocamera had audio recording capability.

[4] It is apparent from Cogan's testimony that not one of the four prosecutors assigned to this case ever made an inquiry of Cogan about the videocamera or the videotape.

this point, defense counsel objected to any unsworn "testimony" from the prosecutor. The prosecutor was then sworn as a witness and testified as follows: "I spoke to the police prosecutor for the Town of Acton. He explained to me, I asked him about the tape which was made, or should have been made on January 10th. He stated to me that the camera was not working on that night and that the tape procedure — that the procedure was not actually videotaped. He had looked at the tape. There was nothing on it. And that was the extent of the — I never asked to see the videotape myself, and I do not have it here today." Defense counsel moved to strike the prosecutor's testimony on hearsay grounds. The judge responded to the motion by asking the prosecutor whether he had any further evidence to present on the motion to dismiss. As he did not, defense counsel called the defendant to testify.

When Cogan advised the defendant that a videotape was being made, she told him that she did not have an attorney, that she did not know whether her "rights were being violated," and that she did not know if it was "legal" for him to make a videotape of her. Cogan told her that it was standard procedure. The defendant stated that Cogan gave her no indication that there was anything wrong with the camera while she was being videotaped.

In denying the motion to dismiss, the judge did not employ the balancing test set out in *United States* v. *Bryant*, 439 F.2d 642, 653 (D.C. Cir. 1971), and adopted in *Commonwealth* v. *Charles*, 397 Mass. 1, 14 (1986). See also *United States* v. *Arra*, 630 F.2d 836, 848-849 (1st Cir. 1980). Instead, he found no evidence of destruction, concealment, or bad faith by the Commonwealth in its failure to produce the videotape. Further, notwithstanding the undisputed events described by defense counsel in his affidavit, the judge suggested that it was the defendant's burden to do more when he also found that the defendant had failed to subpoena the videotape or summons those persons in control of it.

III. *Discussion.*

"[W]e have repeatedly stressed the need for *prosecutors and police* to do their utmost to *preserve and present* 'exculpatory

evidence which is available to the prosecution' (emphasis supplied)." *Commonwealth* v. *Olszewski*, 401 Mass. 749, 754 (1988), quoting from *Commonwealth* v. *Charles*, 397 Mass. at 13-14, which quoted from *Commonwealth* v. *Redding*, 382 Mass. 154, 157 (1980), and cited *Brady* v. *Maryland*, 373 U.S. 83 (1963), and *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 307-310 (1984). Notwithstanding these admonitions, the Commonwealth's conduct in the present case can be described as anything from sloppy to cavalier. Its argument on appeal is that the defendant has no cause to complain because the missing or unavailable videotape cannot be deemed to be either lost or exculpatory.

First, the Commonwealth relies upon the prosecutor's hearsay testimony, given over the defendant's objection, to put forth the following reasoning: because the police prosecutor told the trial prosecutor (in what appears to have been an eleventh hour telephone conversation) that the videotape of the defendant's booking was blank and that, therefore, the videocamera malfunctioned, the tape is nonexistent rather than lost.

Even were the trial prosecutor's hearsay testimony admissible,[5] the police prosecutor's explanation is no more than an assumption, that is, because the videotape is blank the camera had to have been malfunctioning. However, not even Cogan could state with specificity what happened to the videotape once it left his control. There is nothing in the police prosecutor's statement to show that he was familiar with or had examined the camera. The operator of the camera, Cogan, stated that he never had any indication of a malfunction in the machine. More important, it appears that the tape does in fact exist. What the Commonwealth refuses to come to grips with is the simple fact that the defendant will not and need not accept without question the hearsay statement that the videotape is blank.

---

[5] Because defense counsel's objection should have been sustained on hearsay grounds, we do not consider the alternative ground for the objection, that it was inappropriate for the prosecutor to assume the role of a witness.

Equally flawed is the Commonwealth's argument that the defendant's claim that the videotape would exculpate her is no more than an "unsubstantiated allegation" contradicted by the evidence presented at trial. To be sure, the defendant admitted that she had been drinking. The question for the jury, however, was not whether she had been drinking but whether her drinking had diminished her ability to drive safely. See *Commonwealth* v. *Connolly*, 394 Mass. 169, 173 (1985). Any conclusion on this record that the videotape has no exculpatory potential could rest only on an arbitrary preference for the officers' testimony over that of the defendant. Compare *Commonwealth* v. *Charles*, 397 Mass. at 13-14 (the defendant's claim that the Commonwealth had lost an exculpatory tape recording of a conversation [of which he had no personal knowledge] between one of his three victims and a deceased detective was rejected as "conjecture and surmise, contradicted by evidence in the record," that is, the testimony of all three victims, as well as other witnesses, as to the defendant's guilt). In the present case, the record shows no more than a direct conflict in the testimony of the witnesses having personal knowledge of the facts in dispute.

The Commonwealth asks that because the defendant refused to take a breathalyzer, we infer that the videotape would not have been exculpatory. But see G. L. c. 90, § 24(1)(*e*), as appearing in St. 1980, c. 383 (evidence of refusal to submit to testing is inadmissible in a criminal "*proceeding*" [emphasis supplied]). Any force in such an inference would be minimized, however, by the considerations that her refusal should have prompted even greater care with the videotape and that she requested it from the outset and without the slightest hint or suggestion of knowledge on her part that the videocamera had "malfunctioned" or that the videotape could not be produced.

We conclude on the record before us that the defendant sufficiently demonstrated that the lost or destroyed evidence was potentially exculpatory and that the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant must now be weighed. See *Commonwealth* v. *Charles*, 397 Mass. at 14; *Commonwealth* v. *Willie*,

400 Mass. 427, 432-433 (1987); *Commonwealth* v. *Olszewski*, 401 Mass. at 754-755; *Commonwealth* v. *Walker*, 14 Mass. App. Ct. 544, 547-548 (1982).

Had the Commonwealth made appropriate response from the outset to defense counsel's inquiries and requests, it might have been able to show that the videocamera had malfunctioned and that the videotape of the defendant's booking is, through no one's fault, blank. Instead, the Commonwealth chose to do nothing. There is no competent evidence to show the condition of the machine on January 10, 1986, the steps taken (if any) to preserve the evidence, or the condition of the videotape at the time of trial. On the other hand, there are unchallenged factual allegations by defense counsel in his affidavit which demonstrate a strong disinclination by the Commonwealth to provide either the videotape or an explanation for its inability to do so. If there is no evidence of bad faith on the part of the Commonwealth as the judge so found, there is nonetheless ample evidence of the Commonwealth's culpability by reason of negligence or inadvertence. See *Commonwealth* v. *Olszewski*, 401 Mass. at 757 n.7; *Commonwealth* v. *Walker*, 14 Mass. App. Ct. at 547-548.

"[V]ideotapes are 'on balance, a reliable evidentiary resource.' *Commonwealth* v. *Harvey*, 397 Mass. 351, 359 (1986). Consequently, videotapes should be admissible as evidence if they are relevant, they provide a fair representation of that which they purport to depict, and they are not otherwise barred by an exclusionary rule." *Commonwealth* v. *Mahoney*, 400 Mass. 524, 527 (1987). A videotape can be evidence of sobriety as well as inebriation. *Commonwealth* v. *Harvey*, 397 Mass. at 357-359. The videotape might also have assisted the defendant in showing whether the officers exaggerated in their descriptions of her appearance and demeanor, thereby calling their credibility into question. Cf. *Commonwealth* v. *Shipps*, 399 Mass. 820, 826-827 (1987). See generally Erwin, Defense of Drunk Driving Cases § 9.02 (3d ed. 1986). In view of the evidence presented at trial, set out in detail in part I of this opinion, we conclude that the videotape would have been material to the defendant's case and that its loss was substantially

prejudicial to her. Compare *Commonwealth* v. *Charles*, 397 Mass. at 14; *Commonwealth* v. *Walker*, 14 Mass. App. Ct. at 548-549; *Commonwealth* v. *Gabbidon*, 17 Mass. App. Ct. 525, 535-536 (1984), *S.C.*, 398 Mass. 1 (1986); *Commonwealth* v. *Fidler*, 23 Mass. App. Ct. 506, 516 (1987).

All that remains to be considered is the proper remedial action to be taken. We do not think that the circumstances warrant a dismissal of the complaint. See *Commonwealth* v. *Lam Hue To*, 391 Mass. at 313-314 (1984). It was error to refuse to allow the defendant to question about and comment upon the Commonwealth's failure to produce the videotape. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980); *Commonwealth* v. *Richenburg*, 401 Mass. 663, 669 (1988); *Commonwealth* v. *Olszewski*, 401 Mass. at 758. As she had that right at her first trial, it follows that she has that right at any retrial. Because of the Commonwealth's refusal to provide the defendant with a timely explanation for the loss of the videotape, the defendant could not have tested the assertion that the videocamera malfunctioned even had it been offered through competent testimony. Any explanation that could be offered now concerning a malfunctioning of the videocamera would be, at best, mere speculation.

Accordingly, we conclude that at any retrial of the defendant she is free to question and comment about the fact that she was videotaped but the Commonwealth does not now have that evidence. Any evidence that the defendant's videotape is blank or that there was a malfunctioning of or defect in the videocamera must be excluded.

*Judgment reversed.*

*Verdict set aside.*