COMMONWEALTH vs. NORMAN A. SASVILLE, JR.

No. 91-P-1488.

Plymouth. September 21, 1992. - July 23, 1993.

Present: DREBEN. SMITH. & PORADA. JJ.

*Rape. Fair Trial. Practice, Criminal*, Preservation of evidence, Loss of evidence by prosecution, Dismissal. *Evidence*, Scientific test, Paternity, Relevancy and materiality.

In the circumstances of a rape case in which the complainant, who claimed that she became pregnant as a result of the rape, had had an abortion, the Commonwealth was grossly negligent in allowing the destruction of the fetal tissue, which was potentially exculpatory evidence [23-24], highly material to the defendant's defense [25-26]; where the case depended solely on the complainant's credibility, the defendant's inability to have used results of a blood test on the tissue to establish his nonpaternity created a strong possibility of prejudice [26-27], to be remedied by dismissal of the indictment [27-29].

INDICTMENT found and returned in the Superior Court Department on April 9, 1990.

A motion to dismiss was heard by *Cortland A. Mathers*, J., and the case was tried before *Robert W. Banks*, J.

*Joseph F. Krowski* for the defendant.

*Robert C. Thompson*, Assistant District Attorney, for the Commonwealth.

SMITH, J. On April 9, 1990, the defendant was indicted by a Plymouth County grand jury for the forcible rape of a child under sixteen years of age (G. L. c. 265, § 22A). On May 2, 1990, the defendant pleaded not guilty. Prior to trial, the defendant filed a motion to dismiss the indictment on the ground that "the Commonwealth . . . destroyed potentially exculpatory evidence, to wit: a fetus which the victim aborted and which the victim claimed resulted from the sexual act charged in the present case." The motion then stated, "[T]he

Plymouth County District Attorney's Office intentionally destroyed this evidence, authorizing the doctor who performed the abortion to destroy the fetus without blood testing which would have excluded the defendant's paternity."

A Superior Court judge held a hearing on the defendant's motion. After the hearing, the judge ruled that the Commonwealth had indeed destroyed potentially exculpatory evidence. He concluded that, in the circumstances, dismissal of the indictment was not required but that some remedial action was necessary in order that the defendant receive a fair trial. The judge offered the defendant a choice between alternatives: "the defendant [would] be allowed to question the [complainant] at trial about her pregnancy and to question about and comment upon the Commonwealth's failure to produce the fetal tissue, or, in the alternative, the evidence regarding the [complainant's] pregnancy [would] be suppressed." At trial, the defendant chose the second alternative, and, therefore, there was no mention of the complainant's pregnancy. The defendant was convicted by the jury and sentenced to prison.

On appeal, the defendant raises one issue — the denial of his motion to dismiss the indictment. He argues that the remedies proposed by the judge were inadequate to protect his constitutional right to a fair trial and that the indictment should have been dismissed.

We begin with a recitation of facts concerning the destruction of the fetus. Those facts are contained in the judge's memorandum of decision filed after the hearing on the defendant's motion and are supplemented with undisputed facts contained in the investigating officers' reports that were before the judge.

1. *Facts.* On March 30, 1988, the complainant's stepfather telephoned the Bridgewater police station and told a police officer that his stepdaughter had been raped in Middleborough. He further stated that she was pregnant; it was upon discovery of the pregnancy that she immediately told her mother about the rape. The officer asked the stepfather to bring the complainant to the police station. Because the

crime allegedly took place in Middleborough, the officer informed the Middleborough police of the telephone call.

Later the same day, the complainant, her mother, and her stepfather appeared at the Bridgewater police department. By that time, a Middleborough police officer had arrived to join the investigation. The complainant told the police that, on or about October 30, 1987,[1] she had agreed to baby-sit for the defendant's children at their home in Middleborough. The complainant was fourteen years old at the time. The defendant's wife picked up the complainant at her home in Bridgewater and drove to the defendant's home. Shortly after the complainant arrived, the defendant left. His wife left for a bingo game about a half hour later.

At 8:00 P.M. the complainant put the three children to bed, and at 8:30 P.M. the defendant returned home. According to the complainant, she smelled liquor on his breath. He tried to kiss and hug her. When she refused, he held her down on the floor and forcibly raped her. In describing the rape to the police, the complainant furnished specific details. The complainant told the police that, after the defendant raped her, he told her not to tell anyone what had occurred and warned her that she had better keep babysitting for his children. He then dressed and left the house. As was her custom when babysitting at the defendant's house, the complainant stayed overnight. She was "real scared." The next morning she saw the defendant, who asked her if she was "o.k." According to the complainant, she did not respond. The defendant's wife gave her a ride home that morning.

In March, 1988, the complainant felt sick. She had missed her menstrual cycle for four months. On March 30, 1988, she took a home pregnancy test; the results were positive, and she immediately informed her mother of the rape. She had not previously told her mother about the incident because she was frightened. The complainant's stepfather then notified the Bridgewater police of the alleged rape. The police officers listened to the complainant's story; the following

---

[1] The complainant told the police that she was scared and confused and did not remember the exact date of the assault.

day (March 31), the Middleborough police officer applied to the District Court for a summons for the defendant to answer to a charge of rape of a child.

On April 4, 1988, the Middleborough police officer investigating the complaint had a telephone conversation with the complainant's mother. The mother stated that, on March 31, the complainant had an ultrasound procedure performed on her by a doctor in Brookline. The ultrasound showed the gestational age of the fetus to be approximately twenty-three and one-half weeks, which would indicate that the alleged rape took place on or about October 30, 1987.

The mother also informed the police investigator that, on April 2, 1988, the complainant, accompanied by her mother and stepfather, went to New York City, where an abortion was performed by a New York physician. The police officer was then told by the mother that the doctor preserved the aborted fetus in the event that the district attorney's office should authorize blood tests on the fetus.[2]

On April 5, 1988, the Middleborough police officer investigating the matter received a telephone call from her counterpart at the Bridgewater police department; he asked her to telephone the New York doctor in regard to the disposition of the fetus. The Bridgewater police officer had been informed by the district attorney's office that blood tests on the fetus would not be necessary. The Middleborough police officer contacted the New York physician the same day and informed him that blood testing would not be necessary and that the fetus could be destroyed. That day (April 5), a complaint was filed in the Wareham District Court charging the defendant with rape of the complainant.

2. *Obligation of Commonwealth to preserve exculpatory evidence.* The defendant claims that, by allowing the destruction of the fetus before he could perform blood tests that

---

[2]The motion judge made a specific finding that the doctor was informed that the pregnancy was the result of the alleged rape.

would have excluded him as the father, the Commonwealth violated a duty to preserve exculpatory evidence.[3]

It has been held that the Commonwealth has the duty not to destroy exculpatory evidence; rather, it must preserve such evidence for the defendant to inspect, examine, or perform tests on, if he so chooses. *Commonwealth* v. *Neal*, 392 Mass. 1, 10-12 (1984). *Commonwealth* v. *Shipps*, 399 Mass. 820, 834-837 (1987). *Commonwealth* v. *Phoenix*, 409 Mass. 408, 416 (1991). This obligation grows out of the Commonwealth's duty to disclose "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment . . . ." *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963). See *People* v. *Kelly*, 62 N.Y.2d 516, 520 (1984) ("A necessary corollary of the duty to disclose is the obligation to preserve evidence until a request for disclosure is made"). To hold otherwise would allow the Commonwealth's duty to disclose exculpatory evidence to "be avoided by destroying vital evidence before prosecution begins or before defendants hear of its existence." *United States* v. *Bryant*, 439 F.2d 642, 651 (D.C. Cir. 1971). *Commonwealth* v. *Shipps*, 399 Mass. 820, 835 (1987).

3. *Analysis employed when a claim is made that the Commonwealth has failed in its obligation.* In recent years, the courts have been faced with an increasing number of claims that the Commonwealth has lost, destroyed, or otherwise failed to preserve exculpatory evidence that was in its possession. These claims present serious challenges to the courts'

---

[3]Implicit in the defendant's argument is a claim that the Commonwealth had the duty to perform its own blood tests on the fetus, especially where the results might have been exculpatory. We reject that claim. There is no duty on the Commonwealth to collect every piece of evidence that may be potentially exculpatory. *Commonwealth* v. *Neal*, 392 Mass. 1, 7-9 (1984) ("prosecutorial duty to disclose to the defense evidence in the prosecution's possession that is both material to the defendant's guilt or innocence and exculpatory" does not extend "beyond the disclosure of evidence already in existence and in the prosecution's control, to the gathering of evidence potentially helpful to the defense"). *Commonwealth* v. *Lewinski*, 367 Mass. 889, 899-900 (1975). Contrast *Smith* v. *Commonwealth*, 331 Mass. 585, 591-593 (1954). Therefore, the Commonwealth had no *duty* to order its own blood tests of the fetus.

decision-making process because, in order to gauge the worth of the lost or destroyed evidence, the courts often must engage in speculation. See *California* v. *Trombetta*, 467 U.S. 479, 486 (1984) ("Whenever potentially exculpatory evidence is permanently lost [or destroyed], courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed"). In addition, "the loss [or destruction] of evidence which is material and potentially exculpatory poses special problems for a defendant because he is put in a position where he is unable to establish the exculpatory nature of the lost or destroyed evidence." *Commonwealth* v. *Olszewski*, 401 Mass. 749, 753-754 (1988). Therefore, in order to resolve a claim that the Commonwealth has failed to preserve exculpatory evidence, the Supreme Judicial Court has devised the following test.

When a claim has been made that the Commonwealth has lost, destroyed, or otherwise failed to preserve evidence in its possession, custody, or control[4] the defendant need not show conclusively the exculpatory nature of the destroyed evidence but, rather, must establish a " 'reasonable possibility, based on concrete evidence rather than a fertile imagination,' that access to the [destroyed material] would have produced evidence favorable to his cause." *Commonwealth* v. *Neal*, 392 Mass. at 12 (citation omitted). Thus, the defendant must

---

[4]Under *Brady* v. *Maryland, supra,* a prosecutor's duty to disclose exculpatory evidence "extend[s] to material and information in the possession or control of members of his staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office." *Commonwealth* v. *St. Germain*, 381 Mass. 256, 261-262 n.8 (1980), quoting from A.B.A. Standards for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial 2.1(d) (Approved Draft 1970).

In this case, when the complainant's pregnancy was aborted, the fetus was in the possession, custody, and control of the New York doctor. However, once the police knew that the doctor had preserved the fetus in the event the district attorney's office should authorize blood tests, control of the fetus passed to the Commonwealth. It is clear from the record, and not disputed by the Commonwealth, that if the district attorney's office had told the doctor not to destroy the fetus, it would have been preserved. Therefore, during the relevant time period, the Commonwealth had control over the fetus.

first establish that it was reasonably possible that the destroyed evidence was exculpatory.

. If a defendant establishes that the Commonwealth has destroyed potentially exculpatory evidence, then the judge next must consider the appropriateness and extent of remedial action to ensure the defendant's right to a fair trial. *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). "[T]he judge has discretion concerning the manner in which to protect the defendant's rights." *Commonwealth* v. *Lydon*, 413 Mass. 309, 317 (1992), quoting from *Commonwealth* v. *Henderson*, 411 Mass. 308, 310 (1991). In some circumstances, the proper remedy is dismissal of the indictment. *Commonwealth* v. *Henderson*, *supra* at 310.

In determining the appropriateness and extent of the remedy, the judge must employ a balancing test whereby "the culpability of the government will be weighed along with the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *Charles*, 397 Mass. 1, 14 (1986).

4. *Motion judge's analysis of defendant's claim.* The motion judge considered the threshold question whether the Commonwealth had destroyed potentially exculpatory evidence. He took judicial notice of the scientific reliability of blood tests to determine "nonpaternity." He found that "there is a reasonable possibility that testing of the fetal tissue could have led to evidence of the defendant's non-paternity." The judge noted that "[s]uch evidence, although not directly bearing on the issue of whether or not the defendant raped the victim, tends to impeach the [complainant's] credibility since she has claimed that her pregnancy was a result of the alleged rape by the defendant." Therefore, the judge ruled that the failure of the Commonwealth to preserve the fetus deprived the defendant of potentially exculpatory evidence.

As a result of that ruling, the judge next employed the balancing test — weighing "the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant" (*Commonwealth* v. *Willie*, 400

Mass. at 432) in order to fashion an appropriate remedy to protect the defendant's constitutional right to a fair trial.

The judge found that (1) the Commonwealth did not act in bad faith and the culpability of the Commonwealth could be described "at best . . . as negligent"; (2) the evidence was "material" but "not highly material since it doesn't directly bear on the issue of whether the defendant raped the [complainant]"; (3) it was possible "the destruction of the [evidence] was prejudicial to the defendant since it potentially deprived him of an opportunity to impeach the witness's credibility in a case that appears to turn on the credibility of the victim."

After weighing the factors in the balancing test, the judge concluded that the circumstances did not warrant a dismissal of the indictment. In reaching that conclusion, the judge stated that "[t]he central issue in this case is not the paternity of the fetus, but whether or not the defendant raped the victim. Further, blood testing of the fetus would not corroborate the defendant's denial of sexual activity with the [complainant], but rather, could only corroborate his denial of paternity." The judge did, however, conclude that some remedial action was called for in order to ensure a fair trial, and he gave the defendant the choices mentioned earlier in this opinion.

5. *Analysis of motion judge's decision.* We come to our analysis of the issue raised on appeal — whether the judge committed error in denying the defendant's motion to dismiss the indictment.

We agree with the judge (as does the Commonwealth on appeal) that the Commonwealth destroyed potentially exculpatory evidence. For decades, "[t]he reliability of [blood] tests to prove non-paternity [has been] well established as a scientific fact." *Commonwealth* v. *D'Avella,* 339 Mass. 642, 645 (1959). Accordingly, the results of blood tests, if otherwise competent, have been admissible in evidence, even in the absence of statutory authority. *Commonwealth* v. *Stappen,* 336 Mass. 174, 176 (1957). Exclusion of paternity by blood tests is deemed to be conclusive. *Commonwealth* v.

*Beausoleil*, 397 Mass. 206, 209-210 (1986).[5] Therefore, the defendant established a " 'reasonable possibility, based on concrete evidence rather than a fertile imagination,' that access to the [destroyed material] would have produced evidence favorable to his cause." *Commonwealth* v. *Neal*, 392 Mass. at 12.

We now turn to the motion judge's analysis of the factors in the balancing test. He considered all the proper factors. We think, however, that he misunderstood the significance of the complainant's statement to the police and others. As a result, the judge did not properly calibrate the factors in the balancing test and underestimated both the culpability of the Commonwealth and the potential prejudicial effect of the destruction of the evidence. That, in turn, led to the judge's devising a remedy that was inadequate to protect the defendant's constitutional right to a fair trial.

a. *Culpability of the Commonwealth.* Considering the Commonwealth's conduct in this matter, we disagree with the judge's characterization of the Commonwealth's culpability as "at best . . . negligent." We recognize that, during the course of an average day, a district attorney's office receives a considerable amount of information about pending criminal investigations. The information in this case, however, was so extraordinary that its importance was easily distinguishable from the accumulation of information that the office may have received about other investigations. A fourteen year old girl claimed she was raped and, as a result, became pregnant; she had an abortion and the fetus which was the result of the rape was being preserved in the event the district attorney's office authorized blood tests. The worth of such tests to es-

---

[5]Since the 1970's, human leukocyte (HLA) testing, a tissue typing procedure, has been even more reliable than blood tests in excluding men accused of paternity. *Commonwealth* v. *Beausoleil*, 397 Mass. at 210-211.

In their arguments before the motion judge, the Commonwealth and the defendant referred to "blood tests." The police report shows that the New York doctor referred to "blood tests." In his memorandum of decision, the judge mentioned "blood tests" and "examination of fetal tissue" which we take to mean HLA testing. His decision, however, not to dismiss the indictment does not turn on the nature of the tests to be performed on the fetus.

tablish conclusively nonpaternity would be known to any professional in the criminal justice system.[6] Further, the identity of the alleged assailant was known and prosecution was imminent.[7]

It does not require hindsight to recognize that, from the facts available to the district attorney's office and from their knowledge of relevant court decisions, there was only one proper course for the Commonwealth to follow — disclose to the defendant that the fetus was being preserved and was available for blood tests.[8]

Therefore, considering all the circumstances in this extraordinary case, we rule that the culpability of the Commonwealth amounted to a rare case of gross negligence and, in fact, comes perilously close to supporting an inference of bad faith.[9]

---

[6]We deem it significant that the source of the order that resulted in the destruction of the fetus came from the district attorney's office, rather than from the police. The Supreme Judicial Court has " 'repeatedly stressed the need for *prosecutors and police* to do their utmost to *preserve and present* "exculpatory evidence which is available to the prosecution" ' (emphasis supplied)." *Commonwealth* v. *Olszewski*, 401 Mass. 749, 754 (1988), quoting from *Commonwealth* v. *Charles*, 397 Mass. at 13-14. *Commonwealth* v. *Redding*, 382 Mass. 154, 157 (1980).

Prosecutors, because of their legal background, are more likely than the police to be aware of the Commonwealth's obligations in regard to exculpatory or potentially exculpatory evidence. In particular, prosecutors, to a greater extent than the police, would appreciate the value of blood tests to determine nonpaternity.

[7]Indeed, the prosecution commenced on the very day that the doctor was informed by the Commonwealth that the blood tests were not "necessary" and the fetus could be destroyed.

[8]Of course, the district attorney's office could have ordered its own blood tests, but, as we have pointed out in note 3, *supra*, it was not required to do so.

[9]Although conceding that "the spokesperson for the district attorney's office acted with poor judgment," the Commonwealth argues at some length in its brief that its failure to order the fetus preserved did not amount to bad faith.

In Massachusetts, a defendant in a case where evidence is lost or destroyed by the prosecution does not have to show bad faith in order to have an indictment dismissed. See *Commonwealth* v. *Henderson*, 411 Mass. at 309-311.

b. *Materiality of the destroyed evidence.* The motion judge stated in his memorandum that "[the complainant] has claimed that her pregnancy was a result of the alleged rape by the defendant." He then acknowledged that "[s]ince the fetal tissue could have produced evidence of the defendant's non-paternity which would tend to impeach the [complainant's] credibility, and since the [complainant] is the key witness against him, it is conceivable that the evidence could have been material to the defendant's case." The motion judge then noted, however, that the destroyed evidence would not have been highly material "since it [did not] directly bear on the issue of whether the defendant raped the victim."[10] We disagree.

The basis for the defendant's arrest and subsequent indictment was the complainant's statement made to the police and to others that the defendant raped her. Her statement included the claim that, as a result of the rape, she became pregnant. Obviously, as the key prosecution witness, her credibility was of major importance. If blood tests had demonstrated that the defendant was not the father, such evidence would have undoubtedly undermined her credibility in the eyes of the jury. It would also have provided a theory of defense to the defendant, i.e., the complainant fabricated her story in order to provide an explanation for an unwanted pregnancy which resulted from consensual intercourse with another. In any event, negative paternity tests would, without question, have been a real factor in the jury deliberations.

---

[10]The Commonwealth argued to the motion judge that, even if the blood tests had demonstrated that the defendant was *not* the father, such results would not have cleared the defendant of rape because, according to the Commonwealth, the complainant could have had "a voluntary relationship with someone else and still the defendant could have raped her."

The record shows, however, that the complainant claimed that the defendant raped her and, as a result, she became pregnant. The judge found she made that claim.

It would appear that the motion judge found the Commonwealth's argument to be persuasive because not only did he rule that the destroyed evidence was not "highly" material but he also adopted the argument in support of his decision not to dismiss the indictment.

See *Commonwealth* v. *Tucceri*, 412 Mass. 401, 414 (1992).[11] Therefore, the destroyed evidence was highly material.

c. *Prejudice to the defendant.* The motion judge found that "[i]t [was] also possible that the destruction of the fetal tissue was prejudicial to the defendant since it potentially deprived him of an opportunity to impeach the witness's credibility in a case that appears to turn on the credibility of the victim."

Where destroyed evidence is determined to be material, it is nevertheless unlikely that the prejudice to the defendant would be high where there is additional sufficient evidence upon which to convict him. See *Commonwealth* v. *Shipps*, 399 Mass. 820, 836-837 (1987); *Commonwealth* v. *Phoenix*, 409 Mass. 408, 417 (1991). Here, the only evidence of the rape is the complainant's testimony; there was no other evidence upon which the defendant could be convicted.

Further, where the defendant is essentially precluded from presenting a defense, the prejudice is great. See generally *Commonwealth* v. *Francis*, 375 Mass. 211, 213-214, cert. denied, 439 U.S. 872 (1978); *Commonwealth* v. *Olszewski*, 401 Mass. at 756-757. The defendant's ability to impeach the alleged victim was critical to the defendant's defense; it was, in fact, his only defense. The results of the blood test might have provided him with the sole means to impeach the credibility of the alleged victim. Therefore, "the absence of the

---

[11]Whether a defendant has made a request for exculpatory evidence is of importance in considering the question of materiality of undisclosed evidence.

If a specific request is made, a new trial is required if the undisclosed evidence might have affected the outcome of the trial. *Commonwealth* v. *Tucceri, supra* at 405.

If no request or only a general request has been made, the test is whether the undisclosed evidence would have been a real factor in the jury's deliberations. *Id.* at 412-413.

Here, the evidence was destroyed before the defendant knew of its existence, and, therefore, there was no specific request. Assuming, without deciding, that the proper standard to be employed is the one used where there has been no request, we conclude that the destroyed evidence would have been a real factor in the jury's deliberations.

[blood tests] created a strong possibility of prejudice." *Commonwealth* v. *Henderson*, 411 Mass. at 310-311.

6. *The remedy.* Where a court finds that the Commonwealth failed to disclose exculpatory evidence that is material and the nondisclosure was prejudicial to the defendant, a new trial may be ordered. But when potentially exculpatory evidence has been lost or destroyed and that evidence is material and its absence creates a possibility of prejudice, a court is faced with a troubling choice. *California* v. *Trombetta*, 467 U.S. at 486-487. It can attempt to fashion a remedy to ensure that the defendant, despite the loss or destruction of the evidence, receives a fair trial or, if the circumstances warrant it, order the indictment to be dismissed.

Here, because of the Commonwealth's conduct, the defendant was compelled to make a choice between two alternatives, i.e., he could either "question the [complainant] at trial about her pregnancy and . . . question about and comment upon the Commonwealth's failure to produce the fetal tissue" or have "all evidence regarding the pregnancy" suppressed. In the circumstances of this case, we rule that neither choice would have provided the defendant with a fair trial.

The purpose of the choices presented to the defendant by the motion judge was remedial: to ensure that the defendant would receive a fair trial despite the Commonwealth's conduct in allowing the fetus to be destroyed before blood tests could be performed. However, although the defendant was purportedly offered two choices, in fact, neither option presented the required remedial benefit.

If the defendant had selected the first choice, he would have been allowed to question the complainant about her claim that the pregnancy resulted from the rape.[12] The purpose of the questioning, of course, would have been an attempt to impeach her credibility. But in the absence of any concrete evidence (such as negative paternity tests), the success of any impeachment would be remote, at best. In fact,

---

[12]The Commonwealth would not have raised the issue because it was not an essential element of the crime of rape.

raising the issue of the pregnancy and subsequent abortion without any concrete evidence to refute paternity might have resulted in greater harm to the defendant than any benefit. In these circumstances, any comment by the defendant on the failure of the Commonwealth to produce "fetal tissue" would not have provided the defendant with a fair trial. Contrast *Commonwealth v. Cameron*, 25 Mass. App. Ct. 538, 549 (1988).

If the defendant had taken the first choice, the complainant, we are sure, would have testified that the pregnancy was the result of the rape. The only avenue of defense then open to the defendant would have been to establish that the source of the pregnancy was not the defendant but some other individual. Absent any evidence (such as negative paternity tests) to support that claim, the success of such an approach would have been doubtful at best. Further, a comment by defense counsel in his closing argument upon the "Commonwealth's failure to produce the fetal tissue" would not have provided a fair trial, considering a judge's standard instruction that closing arguments are not evidence.

The choice that the defendant selected failed to provide him with a fair trial. Rather, it removed from the defendant any meaningful opportunity to cross-examine the complainant in regard to her credibility based on her story to the police and others.

We recognize that "[a]bsent egregious misconduct or at least a serious threat of prejudice, the remedy of dismissal infringes too severely on the public interest in bringing guilty persons to justice." *Commonwealth v. Cinelli*, 389 Mass. 197, 210, cert. denied, 464 U.S. 860 (1983). However, we rule that, in view of the Commonwealth's conduct and the resulting strong possibility of prejudice to the defendant, the harm to him was irremediable. Therefore, the defendant's motion to dismiss the indictment should have been allowed.

7. *Conclusion.* In order to reach our decision, we have, as in all cases of this type, been forced to engage in speculation in regard to the question whether the destroyed evidence was potentially exculpatory. We are required to do so because

otherwise the "disclosure duty established by *Brady* and its progeny [would be converted] into 'an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal.' " *Commonwealth* v. *Neal*, 392 Mass. at 12, quoting from *United States* v. *Bryant*, 439 F.2d at 648.

We do not intend for our decision to cast a wide net. Certainly, we do not hold that doctors who perform abortions must preserve fetuses that have resulted from alleged rape. Nor do we hold that the Commonwealth *must* perform blood tests on a fetus where there is an abortion after an alleged rape. Our decision is limited to the particular facts of this case.

The judgment is reversed, the verdict is set aside, and a new judgment is to enter dismissing the indictment.

*So ordered.*