Lauriat, J.
Robert L. Longo stands indicted on charges of aggravated rape (four counts) (Indictment No. 92-1699-001), kidnapping (No. 92-1699-002), assault with intent to commit rape (No. 92-1699-003), assault with a dangerous weapon (No. 92-1699-004), intimidation of a witness (No. 92-1699-005), indecent assault and battery on a person over fourteen (No. 92-1699-006), and threatening to commit a crime (No. 92-1699-007). These indictments arise from the defendant’s alleged kidnapping and sexual assault of the alleged victim in Medford, Massachusetts, on the evening of July 16, 1992.
The defendant has now moved to dismiss the indictments in this case on the ground that the Commonwealth has failed to preserve certain exculpatory evidence, to wit: fetal tissue which the alleged victim aborted after becoming pregnant, allegedly as a result of being raped by the defendant.
The court held an evidentiary hearing on the defendant’s motion to dismiss on October 13, 1993. It heard testimony from Lulu Romero (the alleged victim), Massachusetts State Police Officer Laura Beur-man, Sergeant Gregory J. Foley, Assistant Middlesex County District Attorney Thomas F. O’Reilly, and Father William Murphy. The court also received in evi *208 dence copies of certain medical records from the Crittenden Hastings House in Brighton, Massachusetts (Exhibit 1), and certain records from Medicalab, Inc. and Safe Way Disposal Systems, Inc. (Exhibit 2).
Upon consideration of the testimony of the witnesses, the exhibits presented at the hearing, and the memoranda and arguments of counsel, the court makes the following findings of fact and rulings of law with respect to the defendant’s motion to dismiss in this case.
FINDINGS OF FACT
1. Lulu Romero (“Romero”) was allegedly raped by the defendant Robert Longo (“Longo”), a Medford police officer, on the evening of July 16, 1992. Romero told Father William Murphy (“Fr. Murphy”) of the alleged rape and of the defendant’s name and affiliation on July 20, 1992. Fr. Murphy urged Romero to go to a doctor. She saw Dr. Donald M. Green (“Dr. Green”) in Reading, Massachusetts on July 24, 1992.
2. On August 5, 1992, Romero returned to Dr. Green’s office because she had not had her period. Dr. Green performed a pregnancy test that was positive. Fr. Murphy was summoned to Dr. Green’s office, and in his presence Romero was told that she was pregnant. Upon learning of her pregnancy, Romero became hysterical and was immediately hospitalized at the New England Memorial Hospital (“NEMH”) in Stone-ham, Massachusetts. She remained at the NEMH until August 20, 1992.
3. Beginning in the spring of 1992, Fr. Murphy made efforts to help Romero secure so-called “Section 8” housing for herself and her children away from the public housing project on Bonner Street in Medford where she had been living. The initial reason for this request was an incident that allegedly occurred in March or April 1992 involving Romero and one Scott Mann (“Mann"), who lived in a neighboring apartment on Bonner Street. Romero alleged that Mann had exposed himself to her on a street near her apartment and that she had become afraid of him. This incident eventually led to the filing of a criminal complaint against Mann in the Somerville District Court in May 1992. Fr. Murphy was assisting and counselling Romero in connection with this matter.
4. On the basis of the Mann incident and the alleged rape of Romero by Longo, Fr. Murphy determined that Romero should seek Section 8 housing on an emergency basis, and he assisted her in completing the application and related paperwork while she was hospitalized at the NEMH. Fr. Murphy advised the authorities responsible for processing Romero’s Section 8 housing application of the Mann incident and the alleged rape. He also requested Cheri MacDonald (“MacDonald”), a victim-witness advocate assigned to the Somerville District Court, to provide verification of the Mann incident to the Section 8 housing authorities.
5. At some time between August 5,1992 and August 20, 1992, Fr. Murphy also advised MacDonald of Romero’s alleged rape by a Medford police officer, but Romero did not allow Fr. Murphy to disclose the name of her alleged assailant to MacDonald or to the Section 8 housing authorities.
6. At some time during the week of September 14, 1992, MacDonald telephoned Romero about an appointment Romero had in the Somerville District Court, presumably in connection with her pending criminal action against Mann. At this time, Romero apparently disclosed her alleged rape to MacDonald. She advised MacDonald that she was not going to court in the Mann case because she was sick and frightened and intended to move to California because of the rape. She may have also reported the alleged rape to Assistant Middlesex County District Attorney Edward Bedrosian (“Bedrosian”), who was assigned to the Somerville District Court at that time. This information was then apparently reported to the Middlesex County District Attorney’s office in Cambridge, Massachusetts.
7. On or about September 16, 1992, Deputy First Assistant Middlesex County District Attorney Sharon Hanson assigned Assistant Middlesex County District Attorney Thomas F. O’Reilly (“O’Reilly"), to the investigation of an alleged rape of a woman by a police officer. O’Reilly then obtained the name of the alleged victim from MacDonald or Bedrosian and arranged with them to set up an interview with Romero in his office on September 17 or 18, 1992. Romero did not appear for the scheduled interview on either date. On September 20, 1992, Romero’s interview with O’Reilly was rescheduled for September 21, 1992.
8. After Romero was discharged from the NEMH on August 20, 1992, she again conferred with Dr. Green. Although Romero was a devout Roman Catholic and opposed to abortion, she was also frightened and anxious to move back to California with her six children. After conferring with Dr. Green’, Romero decided that she should have an abortion. She also decided that she would report the alleged rape to the police.
9. On September 16, 1992, Romero spoke with a counsellor at the Crittenden-Hastings House (“CHH"), and arranged for an appointment there on September 18, 1992 to have an abortion procedure performed. (Exhibit 1.) On September 18, 1992, the abortion procedure was performed at CHH and Romero was discharged that day. (Exhibit 1.) At the time of her abortion, Romero knew that there were tests that could be performed to determine the likely paternity of the fetus. She did not, however, request that any such tests be performed, and she did not take any steps to ensure that the fetal tissue from her abortion was preserved so that such tests could be performed at a later time.
10. The fetal tissue resulting from Romero’s abortion was delivered by CHH to Medicalab, Inc. in *209 Brockton, Massachusetts, where it was examined for pathology on September 21, 1992. (Exhibit 2.) The fetal tissue was then held at Medicalab, Inc. for approximately two weeks. At some point during the month of October 1992, the fetal tissue from Romero’s abortion was transported from Medicalab, Inc. to Safe Way Disposal Systems, Inc. in Middletown, Connecticut where it was destroyed no later than October 31, 1992. (Exhibit 2.)
11. Romero met with O’Reilly, MacDonald and Massachusetts State Police officer Laura Beurman (“Beur-man”), in O’Reilly’s office on September 21, 1992. At that time, Romero stated that she had been raped by Longo on July 16, 1992 and that she had become pregnant. Romero did not disclose the fact that she was no longer pregnant or that she had had an abortion at CHH on September 18, 1992. O’Reilly and Beurman believed on September 21, 1992 that Romero was still pregnant. Although both O’Reilly and Beurman knew on September 21, 1992 that tests of the fetus or the baby could be performed to determine paternity, neither O’Reilly nor Beurman advised Romero of those tests or of the importance of preserving any fetal tissue from an abortion or miscarriage so that those tests could be performed.
12. On September 28, 1992, Romero decided to leave Massachusetts with her children and travel by bus to Los Angeles, California. When Beurman and Massachusetts State Police Sergeant Gregory Foley (“Foley”) learned that Romero was leaving for California, they went immediately to the Park Square bus station in Boston to meet with Romero. At that time, Romero advised Beurman and Foley that she had been struck in the stomach by her son the night before and that she was having some vaginal bleeding, but that it was under control. Romero declined their requests that she seek medical attention and she boarded a bus for Cleveland, Ohio with her children en route to California.
13. On September 29, 1992, Beurman reached Romero by telephone at the bus station in Cleveland. Romero reported that she had suffered severe vaginal bleeding and thought that she might have suffered a miscarriage. Again, Beurman urged Romero to seek medical attention, but Romero declined, and continued on her trip to California.
14. O’Reilly had an itinerary of Romero’s trip to California. Concerned about Romero’s medical condition, he attempted to locate Romero in Los Angeles, California through the Los Angeles Police Department at about the time of her scheduled arrival there, but she could not be found.
15. Longo was indicted by a Middlesex County Grand Jury on October 7, 1992 and arraigned on the present charges on October 21, 1992. At that time, O’Reilly advised counsel appearing for Longo that he believed that Romero had suffered a miscarriage.
16.In February 1993, Beurman flew to California to interview Romero in connection with this case. At that time, Romero presented Beurman with a document which indicated that Romero had had an abortion at the CHH on September 18, 1992. This was the first time that Romero had advised anyone associated with the Middlesex County District Attorney’s Office that she had voluntarily terminated the pregnancy that had allegedly resulted from her being raped.
RULINGS OF LAW
Defendant asserts in his motion to dismiss that the Commonwealth has failed to preserve potentially exculpatory evidence against him, namely the fetal tissue from Romero’s abortion of September 18, 1992, and that, as a result, he has been deprived of his constitutional right to a fair trial. See Commonwealth v. Neal, 392 Mass. 1, 10-12 (1984). In response, the Commonwealth contends that it did not have any knowledge of, and therefore any possession, custody or control over the fetal tissue from Romero’s abortion, and that it therefore did not lose or destroy that potentially exculpatory evidence.
I.
The Commonwealth has a duty to preserve exculpatory evidence so that a defendant may inspect, examine or perform tests on it, if he so chooses. Commonwealth v. Neal, 392 Mass. 1, 10-12 (1984). This obligation arises from the Commonwealth’s duty to disclose “evidence favorable to an accused upon... request where the evidence is material to guilt or punishment.” Brady v. Maryland, 373 U.S. 83, 87 (1963). This obligation to disclose exculpatory evidence “extend[s] to material and information in the possession or control of members of [the prosecutor’s] staff and of any others who have participated regularly in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office.” Commonwealth v. St. Germain, 381 Mass. 256, 261 n.8 (1980). Once an item of evidence is within the possession or control of the Commonwealth, it may not destroy that item without impeding a defendant’s right to a fair trial.
Where the Commonwealth has knowledge of the existence of aborted fetal tissue from an alleged rape victim, its failure to take steps to preserve that tissue for examination by a defendant charged with the rape has required the dismissal of the indictment against the defendant. Commonwealth v. Sasville, 35 Mass.App.Ct. 15 (1993).
In considering the defendant’s motion to dismiss in this case, the court must first determine whether the Commonwealth was in possession or control of the fetal tissue that resulted from Lulu Romero’s abortion on September 18, 1992. In Sasville, the Commonwealth knew that the aborted fetus was in the possession of a doctor, and that he had preserved it in the event that the Commonwealth should authorize blood *210 tests to be performed on it. The Commonwealth also knew that if it had told the doctor not to destroy the fetus, the fetus would have been preserved. Instead, the Commonwealth allowed the fetus to be destroyed.
In the present case, the Commonwealth became aware of the alleged rape and of Romero’s pregnancy as early as the week of September 14, 1992. It was also aware of the potentially exculpatory nature of the product of that pregnancy, whether it was aborted fetal tissue or the birth of a child. However, unlike the situation in Sasville, the Commonwealth was not aware that Romero had voluntarily terminated her pregnancy until several months after her abortion on September 18, 1992. Indeed, Romero affirmatively concealed the fact of her abortion from the Commonwealth when she met with representatives of the Mid-dlesex County District Attorney’s Office on September 21, 1992 to discuss the details of the alleged rape.
Although the Commonwealth may be faulted for fading to advise Romero of the potential evidentiary importance of her fetus on September 21, 1992 or thereafter,[1] the court concludes that such failure does not, in this case, amount to a failure to preserve potentially exculpatory evidence. Romero not only concealed the fact of her abortion from the Commonwealth, she affirmatively misled the Commonwealth when, as she boarded a bus to California on September 28, 1992, she told Beurman and Foley that she was bleeding vaginally but that the bleeding was under control, and she declined medical attention.
Romero continued to mislead the Commonwealth by advising Beurman, upon her arrival in Cleveland en route to California, that she may have suffered a miscarriage, and yet continued to refuse medical attention. Indeed, at no time prior to being interviewed by Beurman in California in February 1993 did Romero admit to having had an abortion. By that time, it was far too late for the Commonwealth to attempt to preserve the fetal tissue, since that tissue had been destroyed not later than October 31, 1992.
Given these circumstances, the court concludes that the Commonwealth was never in possession, custody or control of the potentially exculpatory fetal tissue in this case, and therefore cannot be held responsible for its destruction.[2]
II.
While the Commonwealth has a duty to preserve any potentially exculpatory evidence in its possession, that duty does not extend beyond the evidence it already possesses. “There is no duty on the Commonwealth to collect every piece of evidence that may be potentially exculpatory.” Commonwealth v. Sasville, 35 Mass.App.Ct. 15, 19 n. 3. (1993), citing Commonwealth v. Lewinski, 367 Mass. 889, 899-900 (1975). The defendant asserts that the Commonwealth was aware that pregnancies either produce a baby or terminate by miscarriage or abortion, and that because the Commonwealth knew of the pregnancy, it should have instructed the alleged victim about the importance of this evidence.
Imposing a duty on the Commonwealth to fathom and preserve every possible item of evidence is unfair. Nevertheless, the court recognizes that when an alleged sexual assault victim reports the crime to the authorities and asserts that she is pregnant as a result, the Commonwealth has an obligation to inform her of the importance of the fetus as evidence in the prosecution of the crime.
In the present case, however, there is no evidence to show that any instructions or warnings to Romero by the Commonwealth would have changed her behavior. Although she had terminated her pregnancy voluntarily three days before reporting the alleged crime to the District Attorney’s office, she never advised the prosecutor that she had aborted the fetus until several months after the fetal tissue had been destroyed.
Therefore, while the Commonwealth may have had an obligation to inform the alleged victim about paternity testing of the fetus, the court concludes that its provision of that information would not have led to the discoveiy or preservation of the fetal tissue in this case.
ORDER
For the forgoing reasons, the defendant’s Motion to Dismiss is DENIED.

 See II., infra

 In so concluding, the court does not reach the issue of weighing “the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant.” Commonwealth v. Willie, 400 Mass. 427, 432 (1987).