Connolly, J.
Defendants, Shane Scott, Scott McQuade, Christopher Campbell, and William Tilton, have been charged as joint venturers with arson, malicious destruction of properly and breaking and entering in the nighttime with intent to commit a felony in connection with a fire at 34 Highland Street, Revere, Massachusetts on December 14, 1990. Defendants move to dismiss the indictments alleging that the Commonwealth intentionally destroyed potentially exculpatory evidence. Defendants further allege that the Commonwealth’s actions deprive them of an opportunity to conduct tests on the destroyed evidence and thereby disprove an essential element of the Commonwealth’s case. Shane Scott also asserts that the Commonwealth, by their actions violated his due process rights as guaranteed under the Sixth and Fourteenth Amendments of the United States Constitution and Article XII of the Massachusetts Declaration of Rights. A hearing was held on December 5 and 6, 1994. After considering all the evidence with due regard to the credibility thereof, and drawing reasonable inferences therefrom, the court makes the following findings of facts and rulings of law.
FINDINGS OF FACT
On December 14, 1990, a fire ravaged through 34 Highland Street, Revere, Massachusetts destroying the premises along with adjacent buildings. On the same date, Captain Frederick Rappa, a fire investigator with the Revere Fire Department and the State Fire Marshall’s Office (FMO) were called in to investigate the fire. Captain Rappa’s role in the investigation was to conduct interviews of witnesses. He was neither involved in the cause and origin investigation nor was he involved in the collecting, packaging and transporting of samples for testing by the State Crime Laboratory (Lab). Rather, the FMO, headed up by Sergeant Kevin McMahon,[2] coordinated the cause and origin investigation. Corporal Dennis Galvin, Trooper Michael Chervin and Captain Gene Dougherty assisted Sergeant McMahon. A cause and origin investigation is a systematic processing of a fire scene which involves examining particular burn patterns to ascertain the area of origin, namely where the fire started. Once the origin is known, the investigators attempt to determine the cause of the fire in that area.
On December 15, 1990, the actual physical investigation of the premises commenced after receipt of a search warrant. Trooper Chervin, with the assistance of a trained State Police arson detection dog named Hulk, collected five samples of debris for testing. Trooper Chervin first walked Hulk through the premises before anything was moved. Hulk alerted[3] to Sample 1 which was collected and labeled “Debris— basement rear” and Sample 1A which was labeled “liquid basement.” Subsequently, one to two feet of debris was removed from the area by an excavator. Hulk walked through the area again and alerted to Sample 2 which was collected and labeled as “Debris— basement — basement rear right.” The same procedure was followed two more times and Samples 3 and 4 were collected and respectively labeled “carpet — basement center” and “wood — basement.” After collecting and labeling the samples in k-pak bags, Trooper Chervin delivered them to Sergeant McMahon.
On December 17, 1990, Sergeant McMahon delivered the samples to the Lab for analysis. Along with the samples Sergeant McMahon submitted a “Request for Examination of Physical Evidence” and signed the form as the “submitting official.” Chemist Paul Maloney (Maloney), then took possession of the samples. Sergeant McMahon never saw the samples again.
On December 17 and 18, 1990, Maloney,[4] the senior State Police Chemist at the Lab in 1990, con *310 ducted a chemical analysis on the five samples by running them through a machine known as a gas chromatograph. His testing produced eight chromatograms which included the five samples test runs and three blank runs. Maloney issued a written report on December 18, 1990 in which he concluded that on Samples 1, 1A and 2, the gas chromatograph detected a medium petroleum distillate. Additionally, the gas chromatograph detected a residue of gasoline on Sample 3. Lastly, no accelerant was detected by the gas chromatograph on Sample 4.
Testifying on behalf of the defendants was Michael Higgins (Higgins), founder and president of K-Chem Laboratories, a private forensic laboratory. Higgins is a specialist in analytical instruments and also conducts arson sample analyses to determine the presence or absence of liquid accelerants. Higgins testified as to the testing procedures and results of the five samples of evidence gathered in this case.
Higgins testified that a gas chromatograph is used to conduct fire analysis. Essentially, a sample will be reduced to a liquid by some method of extraction which is then injected into the gas chromatograph. The gas chromatograph will draw a chromatogram which represents the injected sample. Higgins referred to the gas chromatograph as a “tool of comparison” because the chromatogram of the unknown sample is compared with chromatograms of standards. A standard is a known sample of a material such as paint thinner or gasoline. Comparisons are made until a match is made and the sample is identified.
Higgins testified that a gas chromatograph will only classify petroleum products; it cannot specifically identify them. In this case, Maloney concluded that three samples fell within the class of a medium petroleum distillate. Higgins testified that if he had the actual physical evidence or the remaining liquid extraction, he could have re-run the tests to confirm or disagree with Maloney’s findings. Additionally, Higgins stated that every home or building contains petroleum products. If the physical evidence had been available, Higgins possibly could have conducted tests to specifically identify the petroleum product as being an accelerant or a natural component of the fire.
Higgins further stated that the standards should be run during the same series of runs that are being done for the unknown samples. He reasoned that it is important that the standards be run under the same given set of parameters as the unknown samples. The parameters of the gas chromatograph should be noted at the time of the testing so that the data can be reproduced at a later time.
Higgins noted that Maloney did not run standards at the time he tested the five samples. Further, Higgins stated that Maloney did not note what the parameters were during the testings so it was impossible for Higgins to reproduce the chromatogram. Higgins did state, however, if the parameters are never changed, it is permissible to run standards only periodically. Further, Higgins testified that if he knew the parameters or how the gas chromatograph was calibrated, then he could reproduce the chromatogram with known standards in order to identify the unknown samples.
Higgins also testified that it is good procedure for the chemist to run a blank test before each sample is tested to insure that the machine is not contaminated. In this case. Maloney did not run a blank test before each sample was tested. Overall, Higgins opined that Maloney’s work was conducted haphazardly. Lastly, Higgins testified that he has kept vials of extracted liquid from a sample for eight or nine years which can still be reanalyzed.
John Drugan (Drugan), is a chemist with the Lab. He has worked in the arson/explosion section of the Lab for nine years. In 1990, he and Maloney were the only two chemists at the Lab. Although Drugan did not personally perform the tests on the five samples in this case, he is familiar with the general procedures that the Lab followed in 1990. Drugan explained that liquid was extracted from the five samples by a method known as absorption elusion and stored in a sample vial. A portion of the liquid was injected into the gas chromatograph for testing. Drugan testified that the gas chromatograph will read a sample and produce a chromatogram. The peaks and spreads on the chromatogram will enable the chemist to classify the sample as either light petroleum distillate, medium petroleum distillate or heavy petroleum distillate. This is a general classification. A gas chromatograph can not specifically identify a petroleum distillate within a class. Another test, a GC Mass Graph, can make a more particular identification. The Lab did not possess such a test in 1990.
The remaining unused liquid is saved and stored with the physical evidence and kept in the Lab’s evidence room. Drugan testified that if the liquid is properly stored, it can be maintained for a long period of time. Drugan testified that in his nine years in the arson/explosion section, he has been involved in only one case in which he was ordered to retest samples in the Lab. Drugan further stated that the arson/explosion section of the Lab handles approximately 500 to 1000 cases per year.
The eight chromatograms in this case exhibit some irregularities because some of the data generated by the gas chromatograph appears crossed out and some hand-written notes are inserted. Drugan could not explain these irregularities because no notes existed which offered an explanation. Furthermore, the run numbers are not sequential in this case. Drugan could not explain why the run numbers were not sequential. Drugan did note, however, that at the start of the day, the gas chromatograph starts with run number one and continues numbering until the end of the day. Therefore, if a chemist runs tests on one case, then *311 tests samples from another case and then turns back to the first case, the run numbers will not be sequential. Drugan noted that there is nothing wrong with having test run numbers out of sequential order.
Drugan agreed that running blank tests is a procedure to ensure the machine is not contaminated. In Drugan’s training and experience, however, it is not necessary to run a blank before each and every sample because there are other methods to follow which help insure the machine is not contaminated. These methods include rinsing the syringe which is injected into the machine a number of times with a clean Pentene solvent, using a clean container for each sample and heating the machine up to at least 240 Centigrade. The Lab follows these procedures. In this case, blank tests were run before three of the five samples.
In 1990, Drugan was responsible for programming the parameters of the gas chromatography machine. Drugan testified that the parameters on the machine in the Lab never change. The parameters are the same now as they were in 1990. Drugan produced a document that indicated what the calibrations were for the machine in 1990 although Drugan printed this document out in 1994. Drugan further testified that because the Lab never varies the parameters of the gas chromatograph, chemists do not necessarily need to run standards after each sample. Drugan stated that the Lab has a library of graphs associated with known standards. Therefore, when Drugan runs a sample in a case, he compares the sample chromatogram with the chromatogram in the library and attempts to make a match.
Once an analysis is completed, a final report is sent to the submitting official along with a disposal form. According to the FMO’s procedure, the submitting official is the individual who is authorized to dispose of the evidence. The disposal form requests the authorizing official to take some action with regard to the disposal or retention of the physical evidence. If the evidence is to be disposed, the authorizing official will sign the form and send it back to the Lab. This will authorize the Lab to dispose of the evidence.
Captain Rappa and Sergeant McMahon corroborated on the procedure. Captain Rappa testified that when he has submitted evidence for analysis in an ongoing case, he checks with the prosecutor before giving the authorization to dispose of the evidence. Sergeant McMahon testified that if the results of an analysis come back negative, he will authorize disposal if he is the authorizing official. If the results come back positive, the FMO will pick up the evidence from the Lab and keep it in the FMO’s evidence locker. The FMO will hold on to evidence until the case is resolved or the statute of limitations has run.
In 1990, Maloney was in charge of the evidence room at the Lab. The evidence room is a small walk-in closet approximately ten by ten feet with shelves on three sides. Drugan testified that Maloney was constantly going through the evidence room each month to maintain space for incoming evidence. Drugan stated that samples were supposed to be retained pending trial. In cases where there was a pending trial and the Lab wanted to purge the evidence room, the evidence would normally be given back to the submitting official.
In this case, the proper procedures for disposal were not followed. The disposal form was not properly completed prior to the destruction of the evidence. Sergeant McMahon’s signature does not appear on the form as the authorizing official. Sergeant McMahon denies authorizing the disposal of evidence. He further denies ever taking the evidence from the Lab to store in the FMO’s evidence locker.
There is a notation in the left hand corner of the disposal form which reads “Disposal per Captain Rappa, Revere P.D. 9/3/91, Message relayed from Jennifer in FMO, 9/3 PJM.” Drugan recognized the handwriting as Maloney’s. Captain Rappa denies authorizing the disposal of evidence. He further denies ever being contacted in 1991 by Jennifer or the FMO. Jennifer is a woman who works at the FMO. Captain Rappa testified that he first learned of the evidence’s disposal in July, 1992 when the prosecutor showed him the disposal form. At that point, Captain Rappa contacted Jennifer about the notation. He said that was the only time he had spoken with Jennifer between December 14, 1990 and the present day.
Drugan testified that he searched the evidence room for the samples in July, 1992 and could not find anything. He did find the records regarding the samples which contained the disposal form indicating the evidence was destroyed. Sergeant McMahon first learned the evidence was destroyed in July, 1992 when he went to retrieve the evidence from the Lab for a probable cause hearing.
On September 3, 1991, the fire was still under investigation. Law enforcement officials had some suspects in mind including the defendants but no charges were pending. The defendants did not clearly become the focus of the investigation until June, 1992 when two witnesses came forward. The defendants were charged with the offenses in July, 1992.
RULINGS OF LAW
“The Commonwealth has a duty not to destroy exculpatory evidence; rather, it must preserve such evidence for the defendants] to inspect, examine, or perform tests on if [they] so choose.” Commonwealth v. Sasville, 35 Mass.App.Ct. 15, 19 (1993). This duty is derived from the Commonwealth’s obligation under Brady v. Maryland, 373 U.S. 83, 86 (1963), to disclose all favorable evidence to the defendant. Without the imposition of a duly to preserve evidence, the Commonwealth could avoid its duty under Brady by destroying exculpatory evidence before the prosecution begins or before defendants hear of its existence. *312 Commonwealth v. Shipps, 399 Mass. 820, 835 (1987); Sasville, supra at 19,
The defendant who claims the Commonwealth has lost or destroyed evidence in its custody and control has the initial burden. Commonwealth v. Olszewski, 416 Mass. 707, 714 (1993). The defendant must establish “a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the destroyed evidence would have produced evidence favorable to his cause.” Commonwealth v. Phoenix, 409 Mass. 408, 414 (1991); Sasvüle, supra at 20. The defendant need not demonstrate conclusively the exculpatory nature of the destroyed evidence. Sasville, supra at 20.
Defendants contend that the destruction .of the physical samples gathered from the fire unfairly deprived them of the opportunity to conduct an independent examination and analysis. Based on the record, the court’s decision is a difficult one to make. The evidence appears anything but exculpatory. Three of the five samples tested positive for a medium petroleum distillate and one sample tested positive for gasoline. Only one of the five samples tested negative. Furthermore, Sergeant McMahon and Captain Rappa credibly testified that during their experience as fire investigators, they have never delivered samples to the defendants for re-testing. Drugan also stated that in his nine years at the Lab, he has only been ordered to re-test samples once. This suggests that generally defendants rarely have their own experts test the physical evidence.
Nonetheless, because the law states that the defendants do not have to conclusively demonstrate the exculpatory nature of the physical samples but only have to show a reasonable possibility, the defendants have met their initial burden. Commonwealth v. Neal, 392 Mass. 1, 12 (1984); Sasville, supra at 20. Defendants have demonstrated by concrete evidence that tests are available, the results of which could have been potentially exculpatory. Had the physical evidence been retained, defendants could have performed their own chemical analysis to confirm or deny the Commonwealth’s findings. Moreover, other tests besides the gas chromatograph could have been conducted which may have more specifically identified the sample. The conclusion that a medium petroleum distillate was detected is a classification not an identification. Many buildings and homes in the normal course contain petroleum products. Tests could have been done to determine whether the petroleum product was an accelerant or a natural component of the fire. It is a reasonable possibility that these tests could have shown that the petroleum products found in the samples were not accelerants. These tests actually exist; they are not the product of defendants’ “fertile imagination.” Phoenix, supra at 414 (record did not support a finding that experts would have been able to conduct DNA testing even if the evidence was available).
Once the defendants establish that the Commonwealth has destroyed potentially exculpatory evidence, “the judge next must consider the appropriateness and extent of remedial action to ensure the defendant(s’) right to a fair trial.” Sasville, supra at 21. To make that determination, the court must employ a balancing test. Olszewski, 416 Mass, at 716. “The courts must weigh the culpability of the Commonwealth, the materiality, and the potential prejudice to the defendants].” Phoenix, supra at 414; Olszewski, 416 Mass, at 716, Sasville, supra at 21.
With this test in mind, each factor will be considered in turn.
A. Commonwealth’s culpability in destroying the evidence.
The physical evidence was destroyed on or about September 3, 1991, nine months after the fire. At that time, no charges were pending but the investigation was on-going. Captain Rappa indicated that in September, 1991 they had suspects in mind including the defendants. The defendants, however, were not charged until July, 1992, ten months later, after witnesses came forward implicating them.
A disposal form found in the Lab’s case file demonstrates that the proper procedure for disposing evidence was not followed. Sergeant McMahon submitted the samples for analysis; only he could authorize its disposal. His signature does not appear on the form authorizing the samples’ disposal. Rather, a handwritten notation appears on the form which states “Disposal per Captain Rappa, Revere P.D. 9/3/91, Message relayed from Jennifer in FMO, 9/3 PJM.” Drugan, a chemist at the Lab, recognized the handwriting as Maloney’s, a chemist at the Lab, now retired. Captain Rappa credibly testified that he never gave any such authorization nor was he ever contacted by Jennifer or the FMO in September, 1991. Sergeant McMahon and Captain Rappa both stated that they knew nothing of the samples’ destruction until July, 1992. Furthermore, Sergeant McMahon stated that if evidence tests positive, the FMO will hold on to the evidence in their own evidence locker until the case goes to trial or the statute of limitation runs.
Drugan stated that Maloney was in charge of the Lab’s small evidence room in 1990. Drugan stated that Maloney was constantly going through the evidence room purging cases to make room for incoming cases.
Based on the circumstances, it is reasonable to infer that Maloney destroyed the evidence on his own accord in his zest to maintain space in the evidence room. The record in no way indicates that the Commonwealth in bad faith, intentionally destroyed the samples. Indeed, some culpability must be attributed to the Commonwealth based on the fact that it does not have possession of the physical evidence at issue. Commonwealth v. Repoza, 28 Mass.App.Ct. 321, 325 n.3 (1990). In sum, the Commonwealth’s conduct was negligent. Phoenix, supra at 415. “Negligence or inadvertence are less culpable than bad faith, but they are nevertheless culpable and must be accounted for in *313 the balancing procedure.” Commonwealth v. Olszewski 401 Mass. 749, 757, n.7 (1988).
Defendants rely on Sasville, supra, to claim that the Commonwealth’s actions were grossly negligent. The facts in Sasville, however, are quite distinguishable from this case. In Sasville, a fourteen-year-old girl alleged that the defendant raped her. Id. at 16. She became pregnant and obtained an abortion. Id. at 18. The doctor retained the fetus in the event the prosecutor needed to conduct blood tests. Id. On the very day the defendant was indicted, the prosecutor authorized the disposal of the fetus. Id. Indeed, the identity of the alleged assailant was known and prosecution was imminent. Id. at 24. The court deemed it quite significant that it was the prosecutor rather than the police who authorized the evidence’s destruction, because prosecutors are more likely than police to be aware of their obligation to preserve exculpatory evidence. Id. at 24 n.6. The court held that the Commonwealth’s conduct “amounted to a rare case of gross negligence.” Id. at 15.
In the instant matter, the evidence was destroyed ten months before the defendants were charged. At the time of the destruction, prosecution was not imminent. While the defendants were suspects in September, 1991, the investigation did not focus on them until June, 1992. Additionally, the prosecutor was not involved in authorizing the destruction. In fact, no one involved in investigating the matter authorized the disposal. Rather, the chemist at the Lab disposed of the evidence on his own accord.
B.Materiality of the destroyed evidence.
“Evidence is material if in considering the entire record, it creates a reasonable doubt as to the defendants’] guilt that would not otherwise exist.” Commonwealth v. Otsuki, 411 Mass. 218, 231 (1991), citing Commonwealth v. Wilson, 381 Mass. 90, 107 (1980).
The defendants have been charged with arson and an essential element that the Commonwealth must prove is that the defendants intentionally set the fire. The Commonwealth conducted tests which indicated that petroleum products and gasoline were detected in the samples. If the physical evidence had been available to the defendants, they could have performed their own tests, the results of which may have cast reasonable doubt that they set the fire. Essentially, defendants may have been able to prove the petroleum products were already on the premises and were not accelerants intentionally placed to set the fire. Therefore, the record does reflect that the destroyed samples were material.
C.Prejudice to the defendants.
“Where destroyed evidence is determined to be material, it is nevertheless unlikely that prejudice to the defendant[s] would be high where there is additional sufficient evidence upon which to convict [them].” Sasville, supra at 26. From the record, it appears that apart from the chemical analysis conducted on the destroyed samples, other evidence exists to incriminate the defendants. Captain Rappa indicated that witnesses came forward in June, 1992 who implicated the defendants. As for the incendiary nature of the fire, testimony regarding the actions of the trained arson dog, Hulk, is available. Additionally, there is testimony regarding the particular burn patterns of this fire.
“Furthermore, where the defendants are] essentially precluded from presenting a defense, the prejudice will be high.” Sasville, supra at 26. In Sasville, essentially the Commonwealth’s only evidence that a rape occurred was the victim’s testimony. Id. at 26. The defendant’s only defense was his abiliiy to impeach the victim’s credibility. Id. The defendant’s only real means to impeach her would have been if he could have shown through paternity blood testing on the fetus that he was not the father. Id. The defendant, however, was not given the opportunity to conduct such tests which therefore prevented him from presenting an effective defense. Id.
The defendants in this matter have not been effectively denied the opportunity to present a defense. Olszewski 401 Mass, at 756. This is not a situation as in Sasville where no tests at all were conducted. Id. at 18. The defendants are fully able to impeach the testing techniques, materials and results of the chemical analysis performed by the Commonwealth. Indeed, Higgins, the defense witness, opined that the tests were conducted in a haphazard manner. Higgins pointed out that blank tests nms were not conducted before eveiy sample run. The Commonwealth’s witness, Drugan, even admitted that this is a good procedure. Standards were not run at the same time as the samples. In Higgins’ opinion, this is an important procedure. Additionally, the Commonwealth cannot not explain why the test run numbers were not sequential. Furthermore, Higgins stated that if he knew the parameters of the gas chromatograph under which the samples were tested, he could run his own standards to discern whether the Commonwealth’s findings are accurate. This information is now available to the defendants.
While the destruction of the evidence deprived the defendants of an opportunity to conduct their own tests, the loss is not highly prejudicial. Phoenix, supra at 416; Sasville, supra at 26.
D.Remedy
When balancing the factors, the court has discretion in fashioning a remedy in order to properly protect the defendants’ right to a fair trial. Commonwealth v. Henderson, 411 Mass. 309,310 (1991); Sasville, supra at 21. “Absent egregious misconduct or at least a serious threat of prejudice, the remedy of dismissal infringes too severely on the public interest in bringing guilty persons to justice.” Sasville, supra at 28, quoting Commonwealth v. Cinelli 389 Mass. 197, 210 *314 (1983). The Commonwealth’s conduct in this case, while certainly not laudatory, is not sufficiently egregious to warrant dismissal of the indictments. Olszewski, 416 Mass, at 717. Defendants’ right to a fair trial will be adequately protected by permitting the defendants latitude during their cross examination regarding the destroyed evidence. Cf. Commonwealth v. Bowden, 379 Mass. 472, 485-86 (1979).
ORDER
For the above reasons, the Court ORDERS that defendants’ Shane Scott, Scott McQuade, Christopher Campbell, and William Tilton, individual motions to dismiss are DENIED.

 At the time of the fire, Sergeant McMahon’s rank was corporal.

 Hulk alerts his handler to samples by sitting down and pointing with his nose and hitting with his paw the exact area where he has detected something.

 Paul Maloney retired from the State Police Crime Lab in June, 1992.